## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
DONYELLE LOCUST,                  :
                                  :     Civil Action No. 08-2713 (SRC)
                Petitioner,       :
                                  :
                v.                :     OPINION
                                  :
MICHELLE R. RICCI, et al.,        :
                                  :
                Respondents.      :
```

**APPEARANCES:**

> DONYELLE LOCUST, Petitioner <u>pro</u> <u>se</u>
> #41093 / SBI# 67
> New Jersey State Prison
> P.O. Box 861
> Trenton, New Jersey 08625

> CAREY JEANNE HUFF, ESQ.
> MONMOUTH COUNTY PROSECUTOR'S OFFICE
> Monmouth County Courthouse
> 71 Monument Park
> Freehold, New Jersey 07728
> Counsel for Respondents

**CHESLER**, District Judge

This matter is before the court pursuant to a petition for a writ of habeas corpus under 28 U.S.C. § 2254, filed by petitioner Donyelle Locust, on or about May 30, 2008.  Petitioner also filed a motion to have this habeas action stayed while he exhausts his state court remedies, pursuant to 28 U.S.C. § 2254(c).  For the reasons stated below, this Court will deny Petitioner's motion for a stay and abeyance.

## I.   PROCEDURAL BACKGROUND

Petitioner, Donyelle Locust ("Locust"), was indicted by a Monmouth County grand jury on August 23, 1999, on charges of first degree murder, first degree robbery, possession of a weapon for an unlawful purpose and third degree theft.  Before trial in the Superior Court of New Jersey, Law Division, Monmouth County, Locust's counsel brought a motion to suppress Locust's statements.  The Honorable Patricia Del Bueno Cleary, J.S.C., heard argument and testimony on the motion on March 28, 29, 30 and April 11, 2000.  The motion was denied.  Thereafter, trial was held on June 1, 6, 7, 8, 12, 13, 14, 15 and 16, 2000, before Judge Cleary and a jury.  On June 16, 2000, the jury found Locust guilty of all charges in the indictment.

On August 8, 2000, a sentencing hearing was conducted before Judge Cleary.  Judge Cleary merged counts three and four (possession of a weapon and theft, respectively) into count three (first degree robbery).  Judge Cleary also granted the State's motion to sentence Locust under the No Early Release Act ("NERA") and sentenced Locust to a prison term of 75 years with a 63 year parole bar on count one (first degree murder) and a consecutive term of twenty years in prison with a 17-year parole bar on the robbery count.  Accordingly, Locust was sentenced to an aggregate term of 95 years in prison with an 85% parole disqualifier.

2

On September 20, 2000, Locust filed a direct appeal with the Superior Court of New Jersey, Appellate Division.  In his brief by counsel, Locust alleged that the trial judge erred by admitting an inculpatory statement, refusing to permit testimony from a defense expert, and imposing an illegal and excessive sentence.  Locust also argued that his confession should have been suppressed on the following grounds: (1) that petitioner's request to see his mother was an invocation of his right to silence, which should have been scrupulously observed; (2) that he had not accompanied the officers to the police station voluntarily and his arrest was without probable cause, making his statement unattenuated as a result of the illegal arrest; (3) that his statement was involuntary because his will was overborne due to the fact that he was exhausted and hungry during an eight-hour interrogation where the police officers lied to him.  On May 1, 2003, the conviction was affirmed, but the sentence remanded because NERA did not apply to murders committed before June 2001.  The Supreme Court of New Jersey denied certification on July 21, 2003.  (Petition at ¶¶ 1-9).  At the re-sentencing hearing, the 85% parole disqualifier under NERA  was deleted.  In addition, the sentence on the robbery count was made to run concurrent with the sentence on the murder count.

Locust then filed a petition for post-conviction relief ("PCR") before the Superior Court of New Jersey, Monmouth

3

County.[1]  Locust asserted a claim of ineffective assistance of
counsel as follows: (1) trial counsel failed to object to the
jury composition, in particular, to the fact that a former
employee of the Prosecutor's Office was a member of the panel;
(2) trial counsel failed to raise that Locust's confession was
coerced; (3) trial counsel failed to raise that unknown DNA was
found on his clothing; (4) trial counsel failed to raise the

---

[1]  Here, Locust's judgment of conviction became final 90
days after July 21, 2003, the date that the New Jersey Supreme
Court denied certification on Locust's direct appeal, or on
October 21, 2003.  See Swartz v. Meyers, 204 F.3d 417, 419 (3d
Cir. 2000)(A state-court criminal judgment becomes "final" within
the meaning of § 2244(d)(1) by the conclusion of direct review or
by the expiration of time for seeking such review, including the
90-day period for filing a petition for writ of certiorari in the
United States Supreme Court); Morris v. Horn, 187 F.3d 333, 337
n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13.  Locust had one year
after October 21, 2003, or until October 21, 2004, to file his
federal habeas petition under 28 U.S.C. § 2244(d)(1).  However,
Locust also filed a state PCR petition.  Assuming that he filed
the state PCR petition before October 21, 2004, the limitations
period would be tolled under 28 U.S.C. § 2244(d)(2), until April
7, 2008, the date that the New Jersey Supreme Court denied
certification on petitioner's appeal from denial of his state PCR
petition.  See Stokes v. District Attorney of the County of
Philadelphia, 247 F.3d 539, 542 (3d Cir.), cert. denied, 534 U.S.
959 (2001).  At that point, Locust has the remaining time of the
one-year limitation period running from April 7, 2008 to timely
file his federal habeas petition.

     The question as to how much time is remaining on Locust's
one-year limitation period is not entirely clear from the
petition, nor from the limited record provided by the State in
response to Locust's motion for a stay of his habeas proceedings.
In short, there is no indication in the record provided to date
as to when Locust actually filed his state PCR petition.
However, it would appear that he may have filed his state PCR
petition promptly, and thus, would have had a substantial period
of time remaining on his one-year limitations period when he
filed this habeas petition in May 2008.

possibility of a setup by Detective Seitz, a former police
officer in the City of Long Branch where Locust's mother had
filed a lawsuit against the City of Long Branch; and (5) trial
counsel failed to investigate two witnesses, Brian Pisano and
Barbara Latham.  Locust also claimed that the cumulative effect
of these counsel errors warranted a new trial.  State v. Locust,
2007 WL 2274949, *3 (N.J. App. Div. May 30, 2007), certif.
denied, 195 N.J. 420 (2008).

The state PCR petition was denied on November 18, 2005.
Locust appealed the decision to the Appellate Division.  In the
brief on appeal, in addition to the arguments raised in the PCR
petition, the following arguments were raised concerning
ineffective assistance of counsel:

> A.   Trial counsel failed to challenge and object to an all
> white jury seated in a matter in which the appellant, a
> Black male, was charged with killing a white victim
> knowing that appellant's mother had successfully
> litigated a racial harassment claim against police
> officer in Monmouth County.

> B.   Counsel was ineffective for his failure to raise during
> the Miranda hearing that prior to the appellant's
> confession, the detectives kept him barefoot on a cold
> floor.

> C.   Counsel was ineffective for his failure to bring the
> jury's attention that there was DNA found on
> appellant's clothes that could not have originated from
> him or Mr. Amison.

> D.   Counsel was ineffective for his failure to adequately
> show possible motive on the part of the detectives to
> frame appellant because his mother, Gloria Locust,
> previously sued the Long Branch Police Department for
> racial discrimination and was successful.

E.   Trial counsel was ineffective for ignoring the
     appellant when he told him that the detectives lied
     about seeing blood on his clothes and to highlight that
     it was not until 5:00 p.m. that Detective Seitz
     informed the detectives, who initially met with
     appellant, that he noticed blood at 10:50 a.m.

F.   Trial counsel was ineffective for his failure to
     investigate Brian Pisano timely since he had already
     made a plea deal with the State prior to speaking with
     counsel's investigator as well as Barbara Latham, prior
     to meeting with the Prosecutor.

G.   Trial counsel was ineffective for his failure to argue
     that the State falsified information in his formal
     typed statements.

H.   Trial counsel was ineffective for his failure to file a
     motion to suppress the appellant's clothes and to
     request a probable cause hearing.

I.   Counsel was ineffective for his failure to argue that
     appellant with his diminished capacity was tricked into
     believing that he would be released if he gave the
     police his clothes.

J.   Counsel was ineffective for his failure to inquire as
     to why appellant's investigation and waiving of his
     rights were not videotaped, if so, to disclose a tape.

K.   Counsel was ineffective for his failure to produce
     pictures of the appellant depicting his general
     condition as appearing high.

L.   Counsel was ineffective for his failure to pursue any
     independent areas of investigation in developing his
     defense strategy.

          i.  Psychiatric and Substance Abuse Experts
          ii. Scientific Experts

(R3, Brief of Petitioner-Appellant, State v. Locust, No. A-1885-

05T1, at pp. 23-36, dated April 28, 2006).[2]  In a Certification

───────────────

     [2]  Locust also alleged that his PCR counsel was ineffective
for failing to raise the issues in claims G and L.  Because

signed and dated April 24, 2006, Locust affirms that he had read counsel's brief and that the allegations were true. Specifically, he alleges in his Certification the same points raised in the brief on PCR appeal, as well as adding three more claims:

> 6.   Knowing that I was a drug addict, they purposely prolonged their investigation to force me to give a false confession out of frustration and desperation.
> 10.  One of the jurors and the forewoman, Mrs. Reynolds, used to work in the prosecutor's office.
> 13.  My indictment should have been dismissed because it was based on lies and twisted facts presented to the grand jury.

(R3, Locust Certification at ¶¶ 4,5, 7-9, 11, 12, 14-19 and ¶¶ 6, 10, and 13).  The State addressed all of these claims, albeit briefly, in its response on PCR appeal.  (R4).

The Appellate Division affirmed the denial of the PCR petition, on August 10, 2007, "substantially for the reasons stated in Judge Del Bueno Cleary's thoughtful and comprehensive oral opinion of November 18, 2005." State v. Locust, 2007 WL 2274949, *7 (N.J. Super. A.D. Aug. 10, 2007).  Locust then filed a petition for certification with the New Jersey Supreme Court.  On or about April 8, 2008, the New Jersey Supreme Court denied certification.  (Petition at ¶¶ 10-11); State v. Locust, 195 N.J.

---

ineffective assistance of PCR counsel is not cognizable in a § 2254 action, any such claim intended to be raised by Locust here must be dismissed pursuant to 28 U.S.C. § 2254(i).

420 (2008).  Locust filed a motion for reconsideration, and on May 30, 2008, the Supreme Court of New Jersey denied same.

Thereafter, on or about May 27, 2008, Locust filed this habeas petition under 28 U.S.C. § 2254.  His petition sets forth the following grounds for habeas relief:

(I)   The trial court erred in denying suppression of petitioner's inculpatory statements, both because the police did not honor his request to invoke his right to counsel and to remain silent, and because the statements were the "unattenuated" product of an illegal arrest and involuntary under the totality of circumstances.
   A.   The trial court erred in its evident determination of credibility.
   B.   The police failed to scrupulously honor the defendant's invocation of his right to remain silent.
   C.   The defendant was arrested without probable cause, and his inculpatory statement was the unattenuated result of the illegal arrest.
   D.   The purported confession was the result of an overbearing of the defendant's will and accordingly must be suppressed.

(II)  The trial court erred in refusing to allow petitioner to add a witness during trial, resulting in a denial of his right to a fair trial and due process of law.

(III) Trial counsel was ineffective in that he failed to properly investigate or adequately prepare for trial.

   A.   Trial counsel failed to object to an all-white jury.
   B.   Trial counsel was ineffective for failing to object about a juror who once worked for the Prosecutor's Office.
   C.   Trial counsel was ineffective for not raising at the <u>Miranda</u> hearing that the detectives kept the petitioner barefooted on a cold floor prior to the confession.
   D.   Trial counsel was ineffective for ignoring the petitioner when he was told by the petitioner that

8

the detectives are lying about seeing blood on his clothes.

E.   Trial counsel was ineffective for failing to argue the possibility of a setup by Detective Seitz and that the victim's DNA could have been planted on the petitioner's clothes by the detectives because of the lawsuit against the Long Branch police by the petitioner's mother.

F.   Trial counsel was ineffective for failing to raise that there was DNA on the petitioner's clothes which could not have originated from the petitioner or the victim according to the report by the State's own DNA expert.

G.   Trial counsel was ineffective for failing to timely investigate Brian Pisano and Barbara Latham.

(IV) The accumulation of errors demand that defendant be retried.

However, in a separate motion submitted with his petition, Locust asks that this Court stay the habeas proceedings so that he can exhaust eight claims in state court, which were not raised by petitioner's trial and appellate counsel in his state court proceedings.  These new claims further assert instances of ineffective assistance of counsel as follows:

1.   Trial counsel was ineffective for failing to file a motion to suppress clothes which were the product of an illegal search and seizure.

2.   Trial counsel was ineffective for his failure to object to petitioner's clothes being admitted into evidence.

3.   Trial counsel was ineffective for failing to put in for a probable cause hearing.

4.   Trial counsel was ineffective for failing to investigate why the interrogation and the waiving of his rights were not video-taped.

5.   Trial counsel was ineffective when he failed to argue that as a routine practice the police trick people into signing pre-typed statements with falsified words included in the confession that falsely indicates that the signatory read the statement, which is what happened in petitioner's case.

9

> 6.   Trial counsel was ineffective for failing to put a motion to have the indictment dismissed because it was based on lies and twisted facts presented to the grand jury.
> 7.   Trial counsel was ineffective for his failure to hire expert witnesses to counter the State's expert witnesses where the State introduced their own psychiatric and scientific expert.
> 8.   Trial counsel was ineffective for failing to object to the jury instructions the trial judge gave to the jury where the trial judge told the jury they have to all vote unanimously either guilty or not guilty and the trial judge went on to tell the jury that they can't vote 8 to 4 or 7 to 5.  That was incorrect, because jurors can vote 8 to 4 or 7 to 5 and remain in disagreement with other jurors.  But that's not what they are being told.  If jurors in general were only given these limited instructions there would never be a hung-jury because they are not given that option.

(Petition, Docket entry no. 1-5 at pg. 3).

On January 9, 2009, this Court issued an Order to Show Cause directing Locust to show cause why his habeas petition should be stayed.  Locust replied to the Order to Show Cause and the Mason[3] Notice and Order, on or about January 27, 2009.

In his January 27, 2009 response, Locust provided a certification attesting that he had tried diligently to exhaust all of his claims in state court.  Principally, Locust states that he had tried on numerous occasions to bring his claims to the attention of his state PCR counsel, who did not submit them in his first state PCR proceeding.  Locust also states that he submitted a pro se PCR petition, which was not heard at the oral argument on Locust's state PCR petition.  Locust claims that he

---

[3]   Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000).

10

asked to speak at the hearing, but the PCR judge did not allow him to speak.  After his PCR petition was denied, Locust appealed but the Appellate Division did not address Locust's pro se arguments.  (Docket entry no. 5, Certification of Donyelle Locust at ¶¶ 1-12).

In his January 2009 response letter, Locust also acknowledged the Mason Notice and Order, and asked that his § 2254 habeas petition be dismissed without prejudice so that he could have his unexhausted claims reviewed first in state court. At the time Locust sent his response letter, he had several months remaining on the limitations period for bringing this federal habeas petition, pursuant to 28 U.S.C. § 2244(d). Presently, however, while this action has been pending in this District Court for review, the statute of limitations has expired.  Thus, Locust would not now be able to have this petition dismissed without prejudice, as requested, in order to return to state court to exhaust his remedies.  His only recourse to preserve his exhausted federal habeas claims would be to have this habeas action stayed pending review of his unexhausted claims in state court.  Accordingly, this Court must consider Locust's motion for a stay and determine whether a stay of this action is appropriate regarding his unexhausted claims.

On August 11, 2009, this Court directed that the State respond to Locust's motion for a stay and abeyance of his federal

habeas action.  (Docket entry no. 7).  On September 28, 2009, the
State filed a response, together with a limited state court
record relevant to the issues asserted by petitioner in his
motion for a stay and abeyance.  (Docket entry no. 16).  The
State argues that the motion for a stay should be denied because
Locust has not demonstrated good cause and the unexhausted claims
are without merit.

Locust filed a reply on November 6, 2009.  (Docket entry no.
17).  On February 24, 2010, Locust also submitted documents
concerning his allegation that the police detectives falsified
statements, in particular, witness Brian Pisano's statement.
(Docket entry no. 19).

## II.  FACTUAL BACKGROUND

The facts of this case were recounted below and this Court,
affording the state court's factual determinations the
appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply
reproduce the factual recitation as set forth in the unpublished
opinion of the Superior Court of New Jersey, Appellate Division,
decided on May 1, 2003, with respect to petitioner's direct
appeal from his judgment of conviction and sentence:

> The State charged that defendant robbed seventy-two year old
> Joseph Amison, in Amison's Asbury Park home, after striking
> him several times in the head with a hammer, shattering his
> skull.  Amison died about an hour after the attack.
> Defendant was friends with Amison who paid defendant for odd
> jobs and oral sex, often loaned defendant additional money
> and permitted defendant to stay at his home.

12

I.   The Confession

Shortly after Amison's body was discovered, the police
investigation led to defendant as someone who had been in
Amison's house before the murder.  The State's evidence
revealed that at 10:30 a.m., on the morning of the murder,
investigators located defendant and his girlfriend Bernice
Tolbert outside Tolbert's apartment building.  While
defendant was holding a bottle of beer, he did not appear to
the officers to be under the influence of either drugs or
alcohol.

After initially giving a false name to the police, defendant
agreed to speak to the officers back at the station
regarding an unspecified investigation.  Upon arrival at the
station, the officers placed defendant in a large
training/conference room and Detective Paul Seitz of the
Monmouth County Prosecutor's Office read defendant his
rights, obtained a written waiver from defendant, and then
around 11:00 a.m. began questioning defendant regarding his
relationship with Amison.

He informed defendant that someone had seriously injured
Amison and noticed that defendant did not exhibit any
emotion nor ask about Amison's condition.  Seitz and another
officer also noticed that defendant's pants and sneakers
were bloodstained.  Defendant revealed that he was a thirty-
two year old unemployed drug addict with a tenth grade
education.  During questioning over the next four hours,
defendant was given several breaks, as well as food and
drink.

Defendant insisted that he had last seen Amison the night
before when he stopped by to borrow money for more drugs.
He claimed to have smoked some crack and drank some beer
before leaving with two fifty dollar bills that had been
given to him by Amison.  Defendant further contended that,
after buying more crack and beer, he went to Tolbert's
apartment, where he remained for the rest of the night,
except for brief periods when he went out to buy more drugs.
Despite defendant's revelation that he was a drug addict and
had smoked crack cocaine and consumed alcohol the day
before, Seitz believed defendant was sober and alert during
the interrogation.  Defendant's account was ultimately
memorialized in a formal statement taken between 3:00 p.m.
and 4:00 p.m.  Before taking this statement, Seitz once
again advised defendant of his rights.

While defendant was being interviewed, and unknown to
defendant, Tolbert also gave a formal statement which
conflicted significantly with defendant's account.  She
explained that she drove defendant to Amison's house, just
before midnight, in the hopes that Amison would again loan
him money so they could buy more drugs.  Tolbert got
impatient waiting for defendant and returned home.  She
called Amison's house five times between 12:37 a.m. and 2:58
a.m. and each time defendant answered, telling her he would
be back in a short while.  However, defendant did not return
to her apartment until sometime after 6:30 a.m., about four
hours before the police arrived at her apartment to speak
with defendant.

At about 5:10 p.m., during the interrogation, Seitz resumed
questioning defendant and asked about the inconsistencies
between defendant's story and his girlfriend's, but
defendant continued to maintain his innocence.  Sometime
during this period, defendant asked to use the phone.  Seitz
asked whether defendant wanted to call an attorney.
According to Seitz, defendant replied that only guilty
people need attorneys and he simply wanted to speak with his
mother.  Defendant was told he could call his mother when
they were through with the interview and defendant was asked
if he wanted to continue.  Defendant agreed to proceed with
the interview.  While the interrogation continued,
defendant's mother attempted to contact him at the station.
The police advised defendant's mother that she would be able
to speak with her son later.

Several hours later, a detective asked defendant if he would
turn over his clothing for testing.  While the police
claimed that defendant simply gave up his clothing upon
their request, according to defendant, he asked whether he
could leave in return for relinquishing his clothing and was
told "yes."  In any event, defendant complied with the
clothing request and was given some of his own clothing to
put on.  The detective could not recall whether defendant
was given shoes to wear, and defendant claims he was left
barefoot.  Defendant was not released at that time and
questioning continued.

A short time later, Captain Philip George of the Monmouth
County Prosecutor's Office entered the room carrying a
cotton swab which he had dipped into orange soda.  George
announced that he had done a presumptive test which
indicated that there was blood on defendant's clothes and
shoes.  He said that he was confident the blood would be
identified as Amison's.

At roughly 7:20 p.m., the detective who had collected defendant's clothing relieved Seitz and began to question defendant by stating that there was no doubt in his mind that defendant had killed Amison, but he just wanted to know why, especially because Amison had been friendly with defendant.  After the detective stated that Amison should not have died the way he had, defendant, who was noticeably more emotional, started crying and then confessed saying "I did it."

Thereafter, defendant ate some dinner and was readvised of his rights after being formally arrested.  He gave a second formal statement to the police between 8:35 p.m. and 10:00 p.m.  In this statement, defendant admitted that after Tolbert left him at Amison's house, he asked Amison for more money.  Amison refused and defendant decided that he would stay at the house so he could kill Amison in his sleep and take his money.  Defendant then described how he killed Amison and stole some jewelry.

At the <u>Miranda</u> proceeding, defendant denied committing the murder and contended that his confession was untrue and was not obtained in the manner recited by the State witnesses.  Instead, he asserted that he was tired and under the influence of drugs and alcohol when he was threatened, coerced, tricked and prevented from calling an attorney.  He confessed only because he was a drug addict who needed to get out of the police station, so he told the police what they wanted to hear.  Defendant contended that the police must have lied because his mother, who was a former police dispatcher for the Long Branch Police Department, had previously sued Long Branch and several of its police officers.  The judge rejected defendant's contentions and allowed the confession to be considered by the jury.

(R2, May 1, 2003 Appellate Division Opinion, at pp. 2-7).

### III.  <u>ANALYSIS</u>

#### A.  <u>Pro Se Pleading</u>

Locust brings his habeas petition as a pro se litigant.  A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  A

pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

B.  Exhaustion Analysis

A state prisoner applying for a writ of habeas corpus in federal court must first "exhaust[] the remedies available in the courts of the State," unless "there is an absence of available State corrective process[] or ... circumstances exist that render such process ineffective ... ."[4]  28 U.S.C. § 2254(b)(1).  See also Rose v. Lundy, 455 U.S. 509, 515 (1982); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997), cert. denied, 532 U.S. 919 (2001) (finding that "Supreme Court precedent and the AEDPA mandate that prior to determining the merits of [a] petition, [a court] must consider whether [petitioner] is required to present [his or her] unexhausted claims to the [state's] courts").[5]

---

[4] Exhaustion of state remedies has been required for more than a century, since the Supreme Court's decision in Ex parte Royall, 117 U.S. 241 (1886).  The exhaustion doctrine was first codified at 28 U.S.C. § 2254 in 1948, see Rose v. Lundy, 455 U.S. 509, 516-18 (1982), and was the subject of significant revisions in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104-132, 110 Stat. 1217 (April 24, 1996).

[5] Although a petition for a writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits

16

The exhaustion requirement is intended to allow state courts the first opportunity to pass upon federal constitutional claims, in furtherance of the policies of comity and federalism. Granberry v. Greer, 481 U.S. 129 (1987); Rose, 455 U.S. at 516-18. Exhaustion also has the practical effect of permitting development of a complete factual record in state court, to aid the federal courts in their review. Rose, 455 U.S. at 519.

A petitioner exhausts state remedies by presenting his federal constitutional claims to each level of the state courts empowered to hear those claims, either on direct appeal or in collateral post-conviction proceedings. See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838 (1999) ("requiring state prisoners [in order to fully exhaust their claims] to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"); Lambert v. Blackwell, 134 F.3d at 513 (collateral attack in state court is not required if the petitioner's claim has been considered on direct appeal); 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.") Once a petitioner's federal claims have

---

notwithstanding the petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n. 42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

been fairly presented to the state's highest court, the exhaustion requirement is satisfied. Picard v. Connor, 404 U.S. 270, 275 (1971); Castille v. Peoples, 489 U.S. 346, 350 (1989).

The petitioner generally bears the burden to prove all facts establishing exhaustion. Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993). This means that the claims heard by the state courts must be the "substantial equivalent" of the claims asserted in the federal habeas petition. Picard, 404 U.S. at 275. Reliance on the same constitutional provision is not sufficient; the legal theory and factual predicate must also be the same. Id. at 277.

Where any available procedure remains for the applicant to raise the question presented in the courts of the state, the applicant has not exhausted the available remedies. 28 U.S.C. § 2254(c).

Moreover, the exhaustion doctrine is a "total" exhaustion rule. That is, "a district court must dismiss habeas petitions containing both unexhausted and exhausted claims [('mixed' petitions)]." Lundy, 455 U.S. at 522. At the time Rose v. Lundy was decided, there was no statute of limitations on the filing of federal habeas petitions. The enactment in 1996 of a one-year limitations period for § 2254 habeas petitions,[6] however, "'has altered the context in which the choice of mechanisms for handling mixed petitions is to be made.'" Crews v. Horn, 360 F.3d 146, 151 (3d Cir. 2004) (quoting Zarvela v. Artuz, 254 F.3d

---

[6] See 28 U.S.C. § 2244(d).

18

374, 379 (2d Cir.), <u>cert. denied</u>, 534 U.S. 1015 (2001)).  Because
of the one-year limitations period, dismissal of a timely-filed
mixed petition may forever bar a petitioner from returning to
federal court.  "Staying a habeas petition pending exhaustion of
state remedies is a permissible and effective way to avoid
barring from federal court a petitioner who timely files a mixed
petition."  <u>Crews</u>, 360 F.3d at 151.  Indeed, the Court of Appeals
for the Third Circuit has held that "when an outright dismissal
could jeopardize the timeliness of a collateral attack, a stay is
the only appropriate course of action."  <u>Crews</u>, 360 F.3d at 154.

The Supreme Court has somewhat limited the stay-and-abeyance
rule announced in <u>Crews</u>.

> [S]tay and abeyance should be available only in limited
> circumstances.  ...  [S]tay and abeyance is only
> appropriate when the district court determines there
> was good cause for the petitioner's failure to exhaust
> his claims first in state court.  Moreover, even if a
> petitioner had good cause for that failure, the
> district court would abuse its discretion if it were to
> grant him a stay when his unexhausted claims are
> plainly meritless.
>
> ...
>
> On the other hand, it likely would be an abuse of
> discretion for a district court to deny a stay and to
> dismiss a mixed petition if the petitioner had good
> cause for his failure to exhaust, his unexhausted
> claims are potentially meritorious, and there is no
> indication that the petitioner engaged in intentionally
> dilatory litigation tactics.  In such circumstances,
> the district court should stay, rather than dismiss,
> the mixed petition.  ...  For the same reason, if a
> petitioner presents a district court with a mixed
> petition and the court determines that stay and
> abeyance is inappropriate, the court should allow the
> petitioner to delete the unexhausted claims and to

>proceed with the exhausted claims if dismissal of the
>entire petition would unreasonably impair the
>petitioner's right to obtain federal relief.

Rhines v. Weber, 544 U.S. 269, 277-78 (2005) (citations omitted).

Even where stay and abeyance is appropriate, the district
court's discretion in structuring the stay is limited by the
timeliness concerns reflected in the one-year statute of
limitations.   "Thus, district courts should place reasonable time
limits on a petitioner's trip to state court and back."   Id. at
278.   See also Crews, 360 F.3d at 154 ("If a habeas petition is
stayed, the petitioner should be given a reasonable interval,
normally 30 days, to file his application for state post-
conviction relief, and another reasonable interval after the
denial of that relief to return to federal court.   If a
petitioner fails to meet either time-limit, the stay should be
vacated nunc pro tunc.") (citations omitted).

Few courts have provided guidance as to what constitutes
"good cause" for failing to exhaust a claim in state court within
the meaning of Rhines.   In Pace v. DiGuglielmo, 544 U.S. 408
(2005), the Supreme Court stated: "A petitioner's reasonable
confusion about whether a state filing would be timely will
ordinarily constitute 'good cause' for him to file in federal
court."   544 U.S. at 416.   The United States Court of Appeals for
the Third Circuit has emphasized the need to be mindful of
Justice Stevens's concurrence in Rhines, which cautions that
"'good cause' for failing to exhaust state remedies more promptly

20

... is not intended to impose the sort of strict and inflexible requirement that would 'trap the unwary *pro se* prisoner,'" but has not otherwise defined the standard to be applied. Ellison v. Rogers, 2007 WL 1299120, *3 (3d Cir. May 4, 2007)(quoting Rhines, 544 U.S. at 279 (Stevens, J., concurring)).  Some lower federal courts have adopted the standard for "cause" applicable to procedural defaults, which requires that some "objective factor external to the defense" made it impossible to bring the claim earlier in state court proceedings, as required by Coleman v. Thompson, 501 U.S. 722, 754 (1991)(quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).  See, e.g., Tullis v. Kontah, 2007 WL 915197 (S.D. Ohio)(collecting cases).  In Jackson v. Roe, the Court of Appeals for the Ninth Circuit rejected the contention that Rhines requires a showing of "extraordinary circumstances," but did not otherwise provide guidance.  At the opposite extreme, one court simply requires "a prima facie case that a justifiable, legitimate reason exists which warrants the delay of federal proceedings while exhaustion occurs."  See Brisco v. Scribner, 2005 WL 3500499 (E.D. Cal. Dec. 21, 2005)(Report and Recommendation) *Report and Recommendation* adopted, 2006 WL 568224 (E.D. Cal. March 3, 2006).

Here, Locust admits that he has not fully exhausted all of his claims before filing this federal habeas petition, but argues that he was trying to be diligent in bringing these unexhausted claims in state court.  Principally, Locust states that he

submitted these unexhausted issues in a pro se memorandum during his state PCR proceedings.  He also states that he asked to testify at his state PCR hearing to advance these issues that his counsel did not argue on his behalf.  All of the unexhausted claims involve allegations of ineffective assistance of trial counsel.

The State, however, disputes petitioner's contentions. First, the State submits that only two of the eight alleged unexhausted claims were not presented on state court review.  Six of the eight claims were indeed raised in Locust's appeal of the PCR proceedings.  The Appellate Division plainly stated that it had reviewed Locust's claims and denied them without discussion as they were completely without merit.  (R5, State v. Locust, 2007 WL 2274949, *7 (N.J. App. Div. May 30, 2007)).

For instance, Claims 1 and 2, which relate to the seizure of Locust's clothes, were raised by counsel in the PCR proceeding. Specifically, the claims alleging ineffective assistance of counsel dealt with issues about Locust's clothing, namely, whether the detectives were lying about seeing blood on his clothes, that there was the possibility that the DNA was planted by the detectives on the clothes, and that the DNA evidence on the clothes could not have originated from petitioner or the victim.  Moreover, in ¶ 15 of Locust's certification on appeal from the PCR denial, Locust expressly raises the argument that "[c]ounsel failed to suppress [Locust's] clothes at the

22

suppression hearing." (R3, Petitioner's brief on appeal of denial of PCR, Locust Certification dated April 24, 2006, at pp. Da37-Da39 at ¶ 15).

Similarly, petitioner's purportedly unexhausted Claims 4, 5, 6 and 7 were raised in his certification on appeal from denial of his state PCR petition, in ¶¶ 16, 14, 13, and 18, respectively. (R3, Locust Certification, supra, at ¶¶13, 14, 16 and 18).

Thus, according to the State, that leaves only two unexhausted claims, Claims 3 and 8. These claims contend that Locust's counsel was ineffective for not asking for a probable cause hearing, and that counsel was ineffective for failing to object to a jury charge concerning unanimous verdicts in criminal trials. The State argues that Locust has not shown good cause for failing to raise these claims during the PCR proceedings. First, Locust does not contend, and indeed cannot show, that the facts supporting these claims were not known to him at the time of his PCR proceedings. He simply states that the legal claims were not known to him at that time.

Second, Locust added multiple claims in his appeal once he "discovered" them, through both his counsel's brief on appeal and petitioner's own certification of 19 claims. These multiple claims included 6 of the 8 purported unexhausted claims, except for Claims 3 and 8. Locust cannot explain how he could miss these two claims when he has raised an extensive number of claims during his PCR proceedings and the appeal from the PCR denial.

23

Indeed, the jury instructions were known at the time of trial. Likewise, the issue of a probable cause hearing does not involve facts unknown to petitioner at the time of trial or during his direct appeal or PCR proceedings.

The State also argues that petitioner's diligence should be questioned because he has not sought to bring these claims in state court on a second PCR petition after he filed his motion for a stay and abeyance of this petition. At this point, Locust is beyond the five-year time bar for bringing these claims in state court. See N.J.Ct.R. 3:22-12. Therefore, his claims would not likely be addressed on the merits if he should now file a second PCR petition in state court.

Finally, the State contends that the unexhausted claims are without merit, and his petition should not be stayed accordingly.

On November 6, 2009, in response to the State's arguments, this Court received Locust's Reply Certification. (See Petitioner's Reply Certification, dated October 17, 2009, at Docket entry no. 17). Locust replies that although six of the eight claims were submitted on his PCR appeal, they weren't exhausted because the Appellate Division did not expressly recite them in its opinion of May 30, 2007. He also asserts that the State is trying to "lure" him into a trap so that he won't be able to raise these claims in his federal habeas petition. Next, Locust admits that he did not discover these issues until an inmate paralegal brought them to his attention. He further

24

contends that only one claim was not raised in his PCR appeal. Specifically, he now admits that the claim that counsel was ineffective for not asking for a probable cause hearing was included in his brief on the PCR appeal.  Locust also contends that the trial record does not include any motions or objections at trial by his trial counsel with respect to the eight claims he now wishes to add.  (Id.).

On February 24, 2010, this Court also received a letter from petitioner concerning the transcript of witness Brian Pisano, which he alleges prove his claim that the detectives falsified statements.  (See Docket entry no. 19).  In particular, Locust alleges that the Pisano's statement contains a lie concerning Pisano's ability to read his statement.  Locust attaches both the statement and an excerpt of the cross-examination, to show that Pisano could not read his statement even though he signed the certification stating that he read the statement.  (Id.).  This Court notes from these documents provided by Locust, however, that on cross-examination at trial, Pisano admitted he could not read but that the statement was read to him.  The statement itself also confirms that Pisano had a limited ability to read and write.

Having thoroughly reviewed the submissions by the parties, this Court finds that petitioner has not demonstrated good cause for failing to raise these purported unexhausted claims in state court.  The Court accepts the State's arguments in total, and

rejects Locust's reply certification for the following reasons.
First, it is plain from reviewing the record provided that
petitioner admittedly raised seven of the eight "unexhausted"
claims in his PCR appeal.  These issues were raised in counsel's
brief on the PCR appeal, as well as petitioner's Certification in
support of his PCR appeal.  Simply because the Appellate Division
declined to expressly discuss each claim specifically, it does
not render the claims put forth on appeal by petitioner as
unexhausted.  In this instance, the Appellate Division stated
that it had considered each of the issues set forth in counsel's
brief, as well as the arguments of counsel and was "satisfied
none of them is of sufficient merit to warrant discussion in a
written opinion," in reliance on <u>N.J.Ct.R.</u> 2:11-3(e)(2).  (R5,
<u>State v. Locust</u>, 2007 WL 2274949, *7 (N.J. App.Div., May 30,
2007)).  It is plain from this Court's review of the PCR appeal
brief that most of the alleged unexhausted claims were raised on
PCR appeal, and are thus exhausted.

Moreover, all of these claims relate to trial counsel's
performance during the trial, and thus, should have been known to
petitioner when he first brought his state PCR petition, which
was grounded on claims of ineffective assistance of counsel.  The
"new" claims set forth in the habeas petition are based on the
same facts that gave rise to the original claims of ineffective
assistance of counsel, with the possible exception of Claims 3
and 8, which involve claims that counsel should have asked for a

26

probable cause hearing, and that counsel failed to object to a jury charge on unanimous verdicts.  However, the absence of a motion for a probable cause hearing and a challenge to a jury charge would have been discoverable from the trial court record upon review of same, which petitioner had to have done in bringing the earlier claims relating to ineffective assistance of counsel.

Locust's arguments that none of these challenges, motions, or objections could be found in the trial record are specious. The mere absence of counsel's objections or motions during trial proceedings does not mean that Locust's new claims were not then discoverable.  Indeed, when reviewing a trial record for instances of ineffective assistance of counsel, counsel's omissions are equally evident of alleged deficient representation as are actual acts of deficient performance.  Accordingly, this Court rejects petitioner's argument for lack of merit.

Likewise, Locust's contention that the Pisano statement shows that statements taken by the Prosecutor's office were falsified, calling the veracity of petitioner's statement into question, is fallacious.  Pisano admitted on cross-examination he could not read, but his statement was read to him.  Thus, where the statement clearly states that the affiant could read and write only a little, his affirmance that the statement was true as written is not false.  Petitioner's argument does little to bolster Claim 5 of his alleged unexhausted claims.

Next, this Court also finds that petitioner's exhortations of diligence are belied by his failure to file a second state PCR petition with respect to the purported unexhausted claims.  More than a year has passed since Locust filed his habeas petition, which noted the unexhausted claims, and no effort to file a second PCR petition has been communicated to this Court. Further, it is likely that the state court would reject a second PCR petition asserting these claims under N.J.Ct.R. 3:22-12 (the five-year time bar).

Finally, this Court finds that the two unexhausted claims are meritless, and thus should be dismissed rather than stayed.[7] As to Claim 3, which alleges that trial counsel was ineffective for failing to ask for a probable cause hearing, this Court finds no merit.  The Supreme Court expressly held that even if a defendant was detained without probable cause, such initial error would not affect the conviction or ultimate outcome of the case. Gerstein v. Pugh, 420 U.S. 103, 119 (1975).  In Gerstein, the Court said: "[A] judicial hearing is not prerequisite to prosecution by information. [] [A]lthough a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." Id.  Consequently, in an ineffective

---

[7]  Unexhausted claims may be denied on the merits, notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2).

assistance of counsel claim, under <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), where a defendant must show both deficient performance <u>and</u> prejudice, Locust cannot demonstrate prejudice irrespective of whether his claim is true or not.

Claim 8 deals with a jury charge as to unanimous verdicts. In particular, Locust claims that trail counsel failed to challenge a jury charge concerning unanimous verdicts. Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief. Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

<u>Estelle v. McGuire</u>, 502 U.S. 62, 72-73 (1991) (citations omitted). Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." <u>Smith v. Horn</u>, 120 F.3d 400, 416 (1997), <u>cert</u>. <u>denied</u>, 522

U.S. 1109 (1998).  See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Where such a constitutional error has occurred, it is subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999).  "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless."  Id. at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.  If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

Here, Locust argues that trial counsel failed to challenge a jury charge on unanimous verdicts.  Locust alleges that the

court's instruction to the jury that they must be unanimous, and

can't decide the case on an 8 to 4 or 7 to 5 vote, limits the

jury's understanding that there can be a hung jury.  The trial

judge charged the jury as follows:

> But this is a criminal case.  And, therefore, your verdicts,
> whatever they may be, for the offenses charged, must be
> unanimous.  So all twelve who are ultimately chosen as the
> deliberating jury must agree to the verdict.  So it can't be
> seven to five or eight to four.  You must determine whether
> the defendant is guilty or not guilty unanimously.  So we
> have to have twelve people saying guilty or twelve people
> saying not guilty.
> . . .
>
> It is your duty as jurors to consult with one another and to
> deliberate with a view to reaching an agreement if you can
> do so without violence to individual judgment.  Each of you
> must decide the case for yourself.  But do so only after an
> impartial consideration of the evidence with your fellow
> jurors.
>
> In the course of your deliberations, do not hesitate to re-
> examine your own views and change your opinion if convinced
> it is erroneous.  But do not surrender your honest
> conviction as to the weight or effective evidence solely
> because of the opinion of your fellow jurors or for the mere
> purpose of arriving at a verdict. ...

(R1, Transcript of Trial, dated June 14, 2000, P77:L4-L12;

P78:L19-P79:L6).

Based on the clear instructions as set forth in the trial

transcript, this Court finds no error in the jury charge on

unanimous verdicts that would overtly discourage hung juries.

Indeed, the trial judge reinforced for the jurors that they

should not "surrender" their honest opinion based on the opinion

of other jurors or for the purpose of arriving at a verdict.

(Id., P79:L2-L6).  Consequently, there was no deficient

performance on the part of trial counsel in failing to object to a harmless or non-existent error in a jury charge, which charge did not have the capacity to produce an unjust result.  This claim plainly lacks constitutional dimension and should be denied for lack of merit.

Therefore, this Court concludes that Locust has not demonstrated good cause for his default, and that any unexhausted claims, namely Claim 3 and 8, are wholly lacking in merit.  His request for a stay of his habeas petition so that he can return to state court and exhaust his state court remedies must be denied accordingly.

Because this Court finds that unexhausted Claims 3 and 8 are without merit, these claims will be denied, and the State will be directed to answer the remaining claims in the petition and provide a complete and relevant record.  The Court cautions the State that any argument asserting non-exhaustion in its answer to the habeas petition, which now excludes Claim 3 and 8 as set forth above, would be considered disingenuous in light of the State's contention herein that said remaining claims have been exhausted.

IV.  <u>CONCLUSION</u>

For the foregoing reasons, this Court denies Locust's motion for a stay or abeyance of his federal habeas proceedings.  The Court directs the State to answer the habeas petition and submit the relevant state court record, except as to the unexhausted

32

Claims 3 and 8, which this Court will dismiss from the action as meritless under 28 U.S.C. § 2254(b)(2).  An appropriate Order follows.


                                        s/ Stanley R. Chesler
                                        STANLEY R. CHESLER
                                        United States District Judge
DATED: April 12, 2010

33