## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DONYELLE LOCUST,                  :

               Petitioner,     :     Civil Action No. 08-2713 (SRC)

                     :

               v.              :     **OPINION**

                     :

MICHELLE R. RICCI, et al.,        :

                     :

             Respondents.    :

**APPEARANCES:**

      DONYELLE LOCUST, Petitioner pro se
      #41093 / SBI# 67
      New Jersey State Prison
      P.O. Box 861
      Trenton, New Jersey 08625

      CAREY JEANNE HUFF, ESQ.
      MONMOUTH COUNTY PROSECUTOR'S OFFICE
      Monmouth County Courthouse
      71 Monument Park
      Freehold, New Jersey 07728
      Counsel for Respondents

**CHESLER**, District Judge

This matter is before the court pursuant to a petition for a writ of habeas corpus under 28 U.S.C. § 2254, filed by petitioner Donyelle Locust, challenging his 2000 New Jersey state court conviction. For the reasons stated below, this Court will deny the habeas petition for lack of merit.

I.   PROCEDURAL BACKGROUND

Petitioner, Donyelle Locust ("Locust"), was indicted by a Monmouth County grand jury on August 23, 1999, on charges of first degree murder, first degree robbery, possession of a weapon for an unlawful purpose and third degree theft.  Before trial in the Superior Court of New Jersey, Law Division, Monmouth County, Locust's counsel brought a motion to suppress Locust's statements.  The Honorable Patricia Del Bueno Cleary, J.S.C., heard argument and testimony on the motion on March 28, 29, 30 and April 11, 2000.  The motion was denied.  Thereafter, trial was held on June 1, 6, 7, 8, 12, 13, 14, 15 and 16, 2000, before Judge Cleary and a jury.  On June 16, 2000, the jury found Locust guilty of all charges in the indictment.

On August 8, 2000, a sentencing hearing was conducted before Judge Cleary.  Judge Cleary merged counts three and four (possession of a weapon and theft, respectively) into count three (first degree robbery).  Judge Cleary also granted the State's motion to sentence Locust under the No Early Release Act ("NERA") and sentenced Locust to a prison term of 75 years with a 63 year parole bar on count one (first degree murder) and a consecutive term of twenty years in prison with a 17-year parole bar on the robbery count.  Accordingly, Locust was sentenced to an aggregate term of 95 years in prison with an 85% parole disqualifier.

On September 20, 2000, Locust filed a direct appeal with the Superior Court of New Jersey, Appellate Division.  In his brief by counsel, Locust alleged that the trial judge erred by admitting an inculpatory statement, refusing to permit testimony from a defense expert, and imposing an illegal and excessive sentence.  Locust also argued that his confession should have been suppressed on the following grounds: (1) that petitioner's request to see his mother was an invocation of his right to silence, which should have been scrupulously observed; (2) that he had not accompanied the officers to the police station voluntarily and his arrest was without probable cause, making his sentence unattenuated as a result of the illegal arrest; (3) that his statement was involuntary because his will was overborne due to the fact that he was exhausted and hungry during an eight-hour interrogation where the police officers lied to him.  On May 1, 2003, the conviction was affirmed, but the sentence remanded because NERA did not apply to murders committed before June 2001.  The Supreme Court of New Jersey denied certification on July 21, 2003.  (Petition at ¶¶ 1-9).  At the re-sentencing hearing, the 85% parole disqualifier under NERA  was deleted.  In addition, the sentence on the robbery count was made to run concurrent with the sentence on the murder count.

Locust then filed a petition for post-conviction relief ("PCR") before the Superior Court of New Jersey, Monmouth County.

3

Locust asserted a claim of ineffective assistance of counsel as follows: (1) trial counsel failed to object to the jury composition, in particular, to the fact that a former employee of the Prosecutor's Office was a member of the panel; (2) trial counsel failed to raise that Locust's confession was coerced; (3) trial counsel failed to raise that unknown DNA was found on his clothing; (4) trial counsel failed to raise the possibility of a setup by Detective Seitz, a former police officer in the City of Long Branch where Locust's mother had filed a lawsuit against the City of Long Branch; and (5) trial counsel failed to investigate two witnesses, Brian Pisano and Barbara Latham.  Locust also claimed that the cumulative effect of these counsel errors warranted a new trial.  State v. Locust, 2007 WL 2274949, *3 (N.J. App. Div. May 30, 2007), certif. denied, 195 N.J. 420 (2008).

The state PCR petition was denied on November 18, 2005. Locust appealed the decision to the Appellate Division.  In the brief on appeal, in addition to the arguments raised in the PCR petition, the following arguments were raised concerning ineffective assistance of counsel:

A.  Trial counsel failed to challenge and object to an all white jury seated in a matter in which the appellant, a Black male, was charged with killing a white victim knowing that appellant's mother had successfully litigated a racial harassment claim against police officer in Monmouth County.

4

B.    Counsel was ineffective for his failure to raise during the <u>Miranda</u> hearing that prior to the appellant's confession, the detectives kept him barefoot on a cold floor.

C.    Counsel was ineffective for his failure to bring the jury's attention that there was DNA found on appellant's clothes that could not have originated from him or Mr. Amison.

D.    Counsel was ineffective for his failure to adequately show possible motive on the part of the detectives to frame appellant because his mother, Gloria Locust, previously sued the Long Branch Police Department for racial discrimination and was successful.

E.    Trial counsel was ineffective for ignoring the appellant when he told him that the detectives lied about seeing blood on his clothes and to highlight that it was not until 5:00 p.m. that Detective Seitz informed the detectives, who initially met with appellant, that he noticed blood at 10:50 a.m.

F.    Trial counsel was ineffective for his failure to investigate Brian Pisano timely since he had already made a plea deal with the State prior to speaking with counsel's investigator as well as Barbara Latham, prior to meeting with the Prosecutor.

G.    Trial counsel was ineffective for his failure to argue that the State falsified information in his formal typed statements.

H.    Trial counsel was ineffective for his failure to file a motion to suppress the appellant's clothes and to request a probable cause hearing.

I.    Counsel was ineffective for his failure to argue that appellant with his diminished capacity was tricked into believing that he would be released if he gave the police his clothes.

J.    Counsel was ineffective for his failure to inquire as to why appellant's investigation and waiving of his rights were not videotaped, if so, to disclose a tape.

K.   Counsel was ineffective for his failure to produce pictures of the appellant depicting his general condition as appearing high.

L.   Counsel was ineffective for his failure to pursue any independent areas of investigation in developing his defense strategy.

    i.  Psychiatric and Substance Abuse Experts
    ii. Scientific Experts

(R3, Brief of Petitioner-Appellant, State v. Locust, No. A-1885-05T1, at pp. 23-36, dated April 28, 2006).  In a Certification signed and dated April 24, 2006, Locust affirms that he had read counsel's brief and that the allegations were true. Specifically, he alleges in his Certification the same points raised in the brief on PCR appeal, as well as adding three more claims:

6.   Knowing that I was a drug addict, they purposely prolonged their investigation to force me to give a false confession out of frustration and desperation.
10.  One of the jurors and the forewoman, Mrs. Reynolds, used to work in the prosecutor's office.
13.  My indictment should have been dismissed because it was based on lies and twisted facts presented to the grand jury.

(R3, Locust Certification at ¶¶ 4,5, 7-9, 11, 12, 14-19 and ¶¶ 6, 10, and 13).  The State addressed all of these claims, albeit briefly, in its response on PCR appeal.  (R4).

The Appellate Division affirmed the denial of the PCR petition, on August 10, 2007, "substantially for the reasons stated in Judge Del Bueno Cleary's thoughtful and comprehensive oral opinion of November 18, 2005."  State v. Locust, 2007 WL

2274949, *7 (N.J. Super. A.D. Aug. 10, 2007). Locust then filed a petition for certification with the New Jersey Supreme Court. On or about April 8, 2008, the New Jersey Supreme Court denied certification. (Petition at ¶¶ 10-11); State v. Locust, 195 N.J. 420 (2008). Locust filed a motion for reconsideration, and on May 30, 2008, the Supreme Court of New Jersey denied same.

Thereafter, on or about May 27, 2008, Locust filed this habeas petition under 28 U.S.C. § 2254. His petition sets forth the following grounds for habeas relief:

(I)  The trial court erred in denying suppression of petitioner's inculpatory statements, both because the police did not honor his request to invoke his right to counsel and to remain silent, and because the statements were the "unattenuated" product of an illegal arrest and involuntary under the totality of circumstances.

    A.  The trial court erred in its evident determination of credibility.

    B.  The police failed to scrupulously honor the defendant's invocation of his right to remain silent.

    C.  The defendant was arrested without probable cause, and his inculpatory statement was the unattenuated result of the illegal arrest.

    D.  The purported confession was the result of an overbearing of the defendant's will and accordingly must be suppressed.

(II) The trial court erred in refusing to allow petitioner to add a witness during trial, resulting in a denial of his right to a fair trial and due process of law.

(III)Trial counsel was ineffective in that he failed to properly investigate or adequately prepare for trial.

    A.  Trial counsel failed to object to an all-white jury.

7

B. Trial counsel was ineffective for failing to object about a juror who once worked for the Prosecutor's Office.

C. Trial counsel was ineffective for not raising at the <u>Miranda</u> hearing that the detectives kept the petitioner barefooted on a cold floor prior to the confession.

D. Trial counsel was ineffective for ignoring the petitioner when he was told by the petitioner that the detectives are lying about seeing blood on his clothes.

E. Trial counsel was ineffective for failing to argue the possibility of a setup by Detective Seitz and that the victim's DNA could have been planted on the petitioner's clothes by the detectives because of the lawsuit against the Long Branch police by the petitioner's mother.

F. Trial counsel was ineffective for failing to raise that there was DNA on the petitioner's clothes which could not have originated from the petitioner or the victim according to the report by the State's own DNA expert.

G. Trial counsel was ineffective for failing to timely investigate Brian Pisano and Barbara Latham.

(IV) The accumulation of errors demand that defendant be retried.

However, in a separate motion submitted with his petition, Locust asked that this Court stay the habeas proceedings so that he could exhaust eight claims in state court, which were not raised by petitioner's trial and appellate counsel in his state court proceedings. These new claims further asserted instances of ineffective assistance of counsel as follows:

1. Trial counsel was ineffective for failing to file a motion to suppress clothes which were the product of an illegal search and seizure.

2. Trial counsel was ineffective for his failure to object to petitioner's clothes being admitted into evidence.

3. Trial counsel was ineffective for failing to put in for a probable cause hearing.

8

4.   Trial counsel was ineffective for failing to investigate why the interrogation and the waiving of his rights were not video-taped.

5.   Trial counsel was ineffective when he failed to argue that as a routine practice the police trick people into signing pre-typed statements with falsified words included in the confession that falsely indicates that the signatory read the statement, which is what happened in petitioner's case.

6.   Trial counsel was ineffective for failing to put a motion to have the indictment dismissed because it was based on lies and twisted facts presented to the grand jury.

7.   Trial counsel was ineffective for his failure to hire expert witnesses to counter the State's expert witnesses where the State introduced their own psychiatric and scientific expert.

8.   Trial counsel was ineffective for failing to object to the jury instructions the trial judge gave to the jury where the trial judge told the jury they have to all vote unanimously either guilty or not guilty and the trial judge went on to tell the jury that they can't vote 8 to 4 or 7 to 5.  That was incorrect, because jurors can vote 8 to 4 or 7 to 5 and remain in disagreement with other jurors.  But that's not what they are being told.  If jurors in general were only given these limited instructions there would never be a hung-jury because they are not given that option.

(Petition, Docket entry no. 1-5 at pg. 3).

On January 9, 2009, this Court issued an Order to Show Cause directing Locust to show cause why his habeas petition should be stayed.  Locust replied to the Order to Show Cause and the Mason[1] Notice and Order, on or about January 27, 2009.  Upon review of Locust's response, on August 11, 2009, this Court directed that the State respond to Locust's motion for a stay and abeyance of his federal habeas action.  (Docket entry no. 7).  On September

---

[1]   Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000).

28, 2009, the State filed a response, together with a limited
state court record relevant to the issues asserted by petitioner
in his motion for a stay and abeyance. (Docket entry no. 16).
Locust filed a reply on November 6, 2009. (Docket entry no. 17).
On February 24, 2010, Locust also submitted documents concerning
his allegation that the police detectives falsified statements,
in particular, witness Brian Pisano's statement. (Docket entry
no. 19).

On April 13, 2010, this Court entered an Order denying
Locust's motion for a stay and abeyance of his habeas
proceedings. The Order also dismissed Locust's supplemental
claims #3 and #8, and directed the State to file an answer to the
petition. The State filed an answer to the petition, together
with the relevant state court record, on May 28, 2010. Locust
filed his reply or traverse on November 4, 2010.

## II.  FACTUAL BACKGROUND

The facts of this case were recounted below and this Court,
affording the state court's factual determinations the
appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply
reproduce the factual recitation as set forth in the unpublished
opinion of the Superior Court of New Jersey, Appellate Division,
decided on May 1, 2003, with respect to petitioner's direct
appeal from his judgment of conviction and sentence:

> The State charged that defendant robbed seventy-two year old
> Joseph Amison, in Amison's Asbury Park home, after striking

10

him several times in the head with a hammer, shattering his
skull.   Amison died about an hour after the attack.
Defendant was friends with Amison who paid defendant for odd
jobs and oral sex, often loaned defendant additional money
and permitted defendant to stay at his home.

I.   The Confession

Shortly after Amison's body was discovered, the police
investigation led to defendant as someone who had been in
Amison's house before the murder.   The State's evidence
revealed that at 10:30 a.m., on the morning of the murder,
investigators located defendant and his girlfriend Bernice
Tolbert outside Tolbert's apartment building.   While
defendant was holding a bottle of beer, he did not appear to
the officers to be under the influence of either drugs or
alcohol.

After initially giving a false name to the police, defendant
agreed to speak to the officers back at the station
regarding an unspecified investigation.   Upon arrival at the
station, the officers placed defendant in a large
training/conference room and Detective Paul Seitz of the
Monmouth County Prosecutor's Office read defendant his
rights, obtained a written waiver from defendant, and then
around 11:00 a.m. began questioning defendant regarding his
relationship with Amison.

He informed defendant that someone had seriously injured
Amison and noticed that defendant did not exhibit any
emotion nor ask about Amison's condition.   Seitz and another
officer also noticed that defendant's pants and sneakers
were bloodstained.   Defendant revealed that he was a thirty-
two year old unemployed drug addict with a tenth grade
education.   During questioning over the next four hours,
defendant was given several breaks, as well as food and
drink.

Defendant insisted that he had last seen Amison the night
before when he stopped by to borrow money for more drugs.
He claimed to have smoked some crack and drank some beer
before leaving with two fifty dollar bills that had been
given to him by Amison.   Defendant further contended that,
after buying more crack and beer, he went to Tolbert's
apartment, where he remained for the rest of the night,
except for brief periods when he went out to buy more drugs.
Despite defendant's revelation that he was a drug addict and
had smoked crack cocaine and consumed alcohol the day

11

before, Seitz believed defendant was sober and alert during the interrogation. Defendant's account was ultimately memorialized in a formal statement taken between 3:00 p.m. and 4:00 p.m. Before taking this statement, Seitz once again advised defendant of his rights.

While defendant was being interviewed, and unknown to defendant, Tolbert also gave a formal statement which conflicted significantly with defendant's account. She explained that she drove defendant to Amison's house, just before midnight, in the hopes that Amison would again loan him money so they could buy more drugs. Tolbert got impatient waiting for defendant and returned home. She called Amison's house five times between 12:37 a.m. and 2:58 a.m. and each time defendant answered, telling her he would be back in a short while. However, defendant did not return to her apartment until sometime after 6:30 a.m., about four hours before the police arrived at her apartment to speak with defendant.
At about 5:10 p.m., during the interrogation, Seitz resumed questioning defendant and asked about the inconsistencies between defendant's story and his girlfriend's, but defendant continued to maintain his innocence. Sometime during this period, defendant asked to use the phone. Seitz asked whether defendant wanted to call an attorney. According to Seitz, defendant replied that only guilty people need attorneys and he simply wanted to speak with his mother. Defendant was told he could call his mother when they were through with the interview and defendant was asked if he wanted to continue. Defendant agreed to proceed with the interview. While the interrogation continued, defendant's mother attempted to contact him at the station. The police advised defendant's mother that she would be able to speak with her son later.

Several hours later, a detective asked defendant if he would turn over his clothing for testing. While the police claimed that defendant simply gave up his clothing upon their request, according to defendant, he asked whether he could leave in return for relinquishing his clothing and was told "yes." In any event, defendant complied with the clothing request and was given some of his own clothing to put on. The detective could not recall whether defendant was given shoes to wear, and defendant claims he was left barefoot. Defendant was not released at that time and questioning continued.

A short time later, Captain Philip George of the Monmouth County Prosecutor's Office entered the room carrying a

12

cotton swab which he had dipped into orange soda. George
announced that he had done a presumptive test which
indicated that there was blood on defendant's clothes and
shoes. He said that he was confident the blood would be
identified as Amison's.

At roughly 7:20 p.m., the detective who had collected
defendant's clothing relieved Seitz and began to question
defendant by stating that there was no doubt in his mind
that defendant had killed Amison, but he just wanted to know
why, especially because Amison had been friendly with
defendant. After the detective stated that Amison should
not have died the way he had, defendant, who was noticeably
more emotional, started crying and then confessed saying "I
did it."

Thereafter, defendant ate some dinner and was readvised of
his rights after being formally arrested. He gave a second
formal statement to the police between 8:35 p.m. and 10:00
p.m. In this statement, defendant admitted that after
Tolbert left him at Amison's house, he asked Amison for more
money. Amison refused and defendant decided that he would
stay at the house so he could kill Amison in his sleep and
take his money. Defendant then described how he killed
Amison and stole some jewelry.

At the Miranda proceeding, defendant denied committing the
murder and contended that his confession was untrue and was
not obtained in the manner recited by the State witnesses.
Instead, he asserted that he was tired and under the
influence of drugs and alcohol when he was threatened,
coerced, tricked and prevented from calling an attorney. He
confessed only because he was a drug addict who needed to
get out of the police station, so he told the police what
they wanted to hear. Defendant contended that the police
must have lied because his mother, who was a former police
dispatcher for the Long Branch Police Department, had
previously sued Long Branch and several of its police
officers. The judge rejected defendant's contentions and
allowed the confession to be considered by the jury.

(R2, May 1, 2003 Appellate Division Opinion, at pp. 2-7).

13

III.   STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than
more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429
U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).
A pro se habeas petition and any supporting submissions must be
construed liberally and with a measure of tolerance.  See Royce
v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney
General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v.
Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399
U.S. 912 (1970).  Thus, because Locust is proceeding as a pro se
litigant in this matter, the Court will accord his habeas
petition the liberal construction intended for pro se
petitioners.

Section 2254(a) of Title 28 of the United States Code gives
the court jurisdiction to entertain a habeas petition challenging
a state conviction or sentence only where the inmate's custody
violates federal law.  28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to
deciding whether a conviction violated the Constitution, laws, or
treaties of the United States."  Estelle v. McGuire, 502 U.S. 62,
67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County
Probation Dep't, 128 F.3d 152, 159 (3d Cir. 1997).  "Federal
courts hold no supervisory authority over state judicial
proceedings and may intervene only to correct wrongs of

14

constitutional dimension." <u>Smith v. Phillips</u>, 455 U.S. 209, 221 (1982). Generally, "[i]f a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable," <u>Engle v. Isaac</u>, 456 U.S. 107, 120 n. 19 (1982), and "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005).

In reviewing a § 2254 petition, a federal court is not permitted to address a federal constitutional claim pertinent to the facts of the case unless the petitioner asserts the claim as a ground for relief. That is, "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." <u>Johnson v. Rosemeyer</u>, 117 F.3d 104, 110 (3d Cir. 1997). In addition, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." <u>Smith v. Horn</u>, 120 F.3d 400, 414 (3d Cir. 1997)(citations and internal quotation marks omitted); <u>see also</u> <u>Smith v. Zimmerman</u>, 768 F.2d 69, 71, 73 (3d Cir. 1985).

In addition to the case law, the Antiterrorism and Effective Death Penalty Act ("AEDPA") limits a federal court's authority to grant habeas relief when a state court has adjudicated petitioner's federal claim on the merits. <u>See</u> 28 U.S.C. § 2254(d). Where a federal claim was "adjudicated on the merits" in state court proceedings, the writ must be denied unless

15

adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on unreasonable determination of the facts in light of the evidence before the state court.  See 28 U.S.C. § 2254(d).

The unreasonableness standards of § 2254(d) govern only claims that were "adjudicated on the merits in State Court proceedings." 28 U.S.C. § 2254(d). "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004)(citations and internal quotation marks omitted), reversed on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374 (2005); see also Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006). A state court may render an adjudication on the merits of a federal claim by rejecting the claim without any discussion whatsoever. See Rompilla, 355 F.3d at 247. See also Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538 U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)(even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference)). On the other hand, "[i]f the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply." Rolan, 445 F.3d at 678. See also Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000)(with respect to claims

presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment), <u>cert. denied</u>, 532 U.S. 924 (2001); <u>Purnell v. Hendricks</u>, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).

If the New Jersey courts adjudicated the petitioner's claims on the merits, this Court may not grant relief unless either § 2254(d)(1) or § 2254(d)(2) is satisfied. <u>See</u> 28 U.S.C. § 2254(d). Accordingly, this Court may not grant habeas relief to the petitioner unless the adjudication of a federal claim by the New Jersey courts involved an unreasonable application of clearly established Supreme Court law, <u>see</u> 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and Adamson is in custody in violation of the Constitution or laws or treaties of the United States. <u>See</u> 28 U.S.C. § 2254(a), (d)(2).

When the grounds raised in the petition are governed by 28 U.S.C. § 2254(d)(1), the court must begin its analysis by determining the relevant law clearly established by the Supreme Court. <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000). A court must look for "the governing legal principle or principles set forth by the Supreme Court at the

17

time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within 28 U .S.C. § 2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.[2] See id. at 409-10. "The unreasonable application test is an objective one-a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005) (quoting Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)).

---

[2] See also Marshall v. Hendricks, 307 F.3d 36, 71 n. 24 (3d Cir. 2002)("[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent.")(citations and internal quotation marks omitted).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence. See Duncan, 256 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

## IV. ANALYSIS

### A. Petitioner's Confession

In his first claim for habeas relief, Locust asserts that the trial court erred in denying suppression of Locust's inculpatory statements on three grounds. First, Locust contends that the police did not honor his request to invoke his right to counsel and his right to remain silent. Second, the statements were the "unattenuated" product of an illegal arrest without probable case. Third, the statements were the result of an overbearing of his will, and consequently, his confession was involuntary under the totality of the circumstances.

These claims were raised on direct appeal.

1. *Right to Counsel and Right to Silence Claim*

On direct appeal, the Appellate Division rejected Locust's claim that the police did not scrupulously honor his right to counsel and his right to remain silent. Locust contends that his request to speak with his mother was an invocation of these rights. The Appellate Division found:

> In general, the police must "'scrupulously honor'" a suspect's right to silence. State v. New Jersey, 151 N.J. 117, 221 (1997)(quoting State v. Johnson, 120 N.J. 263, 282 (1990)), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). A request to speak with a close family member may be "tantamount" to an invocation of the right to silence under some circumstances. Id. at 222. Defendant contends his request to speak with his mother was an invocation of the right to silence and that by continuing the questioning, the police "violated the bright-line rule" of State v. Hartley, 103 N.J. 252, 267 (1986), and his statement must be suppressed as unconstitutionally compelled. State v. Harvey, supra, 151 N.J. at 223.

> However, not every request by a defendant or break in questioning is an invocation of the right to silence. Id. at 222. In order to invoke the bright-line rule and require scrupulous adherence to defendant's request to speak with a family member, the request must be made for the purpose of obtaining advice from a trusted family member. See State v. Brooks, 309 N.J. Super. 43, 56-57 (App. Div.), certif. denied, 156 N.J. 386 (1998). In other words, the request must be the equivalent of a direct statement that defendant does not wish to continue speaking with the police or wishes to obtain advice from the family member before any interrogation continues. Id. at 56. Stated another way, the request must be the equivalent of a request to halt the questioning.

> If the police are unsure whether defendant is asserting a right to silence, they must either stop the interrogation entirely or "ask only questions narrowly directed to determining whether defendant was willing to continue." State v. Harvey, supra, 151 N.J. at 221, quoting State v. Johnson, supra, 120 N.J. at 284.

In assessing whether the police scrupulously honored a defendant's right to silence, a reviewing court must consider not merely the words spoken by defendant, but the full context in which they were spoken. State v. Martini, 131 N.J. 176, 231-32 (1993); State v. Brooks, supra, 309 N.J. Super. at 55. Circumstances to be considered include: (1) whether defendant had ever expressed or exhibited any unwillingness to speak with police; (2) whether defendant indicated or implied in some way that he or she wanted advice; and (3) whether defendant had signed a waiver form. See Id. at 55-56.

Here, the circumstances indicate that defendant was not, in fact, invoking his right to silence. Defendant expressly denied that he needed the assistance of counsel and thereby implied that his call to his mother would not be for obtaining advice but for some other purpose. Defendant also willingly agreed to postpone his call and appeared eager to bolster his claim of innocence. Indeed, according to the officers, defendant did not exhibit any unwillingness to speak with police at any time during the interrogation. Moreover, defendant signed several waiver forms, expressly waiving the assistance of an attorney and his right to silence. Consequently, we reject this argument.

In addition, defendant has argued here and in other contentions that the police testimony was so unworthy of belief that we should reject the judge' findings, which largely accepted the State's account. In response, we merely note that the judge's findings were based on sufficient, credible evidence present in the record and as an appellate court we are bound by these findings. State v. Locurto, 157 N.J. 463, 472-74 (1999).

(Re 29,[3] May 1, 2003 Appellate Division Opinion at pp. 8-10, Docket entry no. 16-6).

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-

---

[3] "Re" denotes Respondents' Exhibits, which encompass the relevant state court record in this matter.

incrimination.  See Malloy v. Hogan, 378 U.S. 1, 8 (1964).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation ... contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  When police ask questions of a suspect in custody without administering the required warnings, Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. See Oregon v. Elstad, 470 U.S. 298, 317 (1985).  Thus, a confession taken during a custodial interrogation without the provision of Miranda warnings violates the privilege against self-incrimination.  See Thompson v. Keohane, 516 U.S. 99 (1995).

"To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the Miranda Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation."  Thompson, 516 U.S. at 107; Miranda, 384 U.S. at 479.  The Miranda Court outlined the procedures to be followed after the police provide these warnings.  If the accused requests counsel, then "interrogation must cease until an attorney is present."  Miranda, 384 U.S. at 474.

The Supreme Court has not held that the request to speak to a parent or grandparent is tantamount to a request for counsel, so as to render any statements made following such a request per se inadmissible under the Fifth and Fourteenth Amendments.  See Fare v. Michael C., 442 U.S. 707, 719 (1979)("The per se aspect of Miranda was ... based on the unique role the lawyer plays in the adversary system of criminal justice in the country."); Smith v. Scribner, 384 Fed. Appx. 672, 2010 WL 2545679 (9th Cir. June 21, 2010), cert. denied, 131 S.Ct. 526 (Nov. 1, 2010); United States ex rel. Riley v. Franzen, 653 F.2d 1153, 1158-62 (7th Cir.)(per curiam)("[W]e do not believe that [the minor suspect's] request for his father constituted an invocation either of his right to silence or of his right to counsel"), cert. denied, 454 U.S. 1067 (1981).

In his petition, Locust essentially argues that his version of the facts are correct and that the trial court erred in finding the police testimony more credible.  He contends that he repeated asked to speak with his mother.  He also "vehemently maintains that he did in fact make a request for an attorney." (Petitioner's Traverse at pg. 50).  However, as pointed out by respondents, and as demonstrated by the state court record, Locust's version of the facts were repeatedly tested against the State's evidence in the original motions to suppress, at trial, on direct appeal and on state collateral review.  The trial court rejected Locust's arguments in the suppression motions, crediting

the State's witnesses. Similarly, the jury rejected Locust's contentions, finding him guilty on all counts. On direct appeal, the Appellate Division deferred to the factual findings of the trial court and the jury, holding that they were supported by sufficient credible evidence in the record. (RE 29, May 1, 2003 Appellate Division Opinion at pg. 10). In the state PCR proceedings, the trial court again rejected Locust's version of facts and the Appellate Division affirmed based on its prior recitation of facts.

Thus, Locust's factual allegations in this regard are not supported by the record and must be rejected. As stated above, a presumption of correctness applies to the trial court's fact finding and a habeas petitioner has the burden of rebutting this presumption by clear and convincing evidence. See 28 U.S.C. § 2254(e)(I). Federal courts must give deference to the factual findings and legal determinations of the state trial and appellate courts. Dunn v. Colleran, 247 F.3d 450, 457 (3d Cir. 2001).

Moreover, the record clearly shows that Locust had been advised of his Miranda rights and understood that he had the right to counsel. He did not ask for an attorney and did not say that he wanted to speak to his mother to ask her to obtain counsel for him. Locust was not a minor at the time of his interrogation. Under the facts of this case, and the totality of circumstances as discussed more fully below, Locust's requests to

24

call his mother did not constitute an invocation of his right to remain silent or his right to counsel.

Consequently, after careful review of the record, this Court cannot conclude that the determination of the trial court in admitting petitioner's confession resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. <u>Williams v. Taylor</u>, <u>supra</u>. The state courts applied the correct law and facts in reaching its determination that there was no per se <u>Miranda</u> violation in this regard. Petitioner has failed to demonstrate that the state court opinions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified. <u>Matteo</u>, 171 F.3d at 891. Therefore, the Court will deny federal habeas relief on this claim because the alleged violation of petitioner's Fifth and Fourteenth Amendment rights is substantively meritless.

2. *Confession Was the Unattenuated Result of an Illegal Arrest Made Without Probable Cause*

Locust next contends that his confession was unlawfully obtained as a result of an illegal arrest without probable cause. This claim was raised on direct appeal, and the appellate court ruled as follows:

> Defendant claimed that he only agreed to accompany the officers back to the station after they confirmed that the

25

matter would not take too long.  According to defendant, once he agreed, one of the detectives grabbed him by the back of his pants and forced him into the back seat of the police car, though he was not handcuffed.  Defendant argues that his forceful placement in the police car was an unlawful arrest and that his inculpatory statement was tainted by the initial illegal arrest.

Generally, evidence obtained following a violation of defendant's federal or state constitutional rights will be excluded as proof against defendant unless it can be shown that it was obtained in a "sufficiently independent" manner to "dissipate the taint" of the prior illegal conduct.  State v. Johnson, 118 N.J. 639, 651-53 (1990).  "[A] confession obtained through custodial interrogation after an illegal arrest should be excluded unless the chain of causation between the illegal arrest and the confession is sufficiently attenuated so that the confession was 'sufficiently an act of free will to purge the primary taint.'"  State v. Chippero, 164 N.J. 342, 353 (2000)(quoting State v. Worlock, 117 N.J. 596, 621 (1990)).

Here, the trial judge concluded that defendant's appearance in the police station was voluntary.  She also noted that notwithstanding the police position that defendant was free to leave until he made his admission, it was "inconceivable" that they would have actually let him leave once they viewed his bloodstained clothes and learned of his lies.  Nonetheless, the judge opined that though the police did not formally arrest defendant until 8:30 p.m., defendant's knowledge of the victim, initial denial of his involvement, subsequent lies and evasions, and bloodstained clothes, would have given them sufficient probable cause to have arrested him prior to his admission.  Accordingly, the judge concluded that defendant was properly in custody at the time he made his incriminating statement.

The judge further ruled that, even if defendant's presence at headquarters could be construed as an unlawful arrest, his confession was ultimately an act of free will and any taint purged by intervening events.  The judge emphasized that the atmosphere during the detention was not especially onerous, defendant was not handcuffed or otherwise physically restrained, and the police did not engage in any conduct designed to frighten or confuse defendant.  Additionally, the judge noted that defendant made his admissions after being confronted with not only the inconsistencies in his statement but also the supposed proof that there was blood on his clothes.  Moreover, defendant's

statement came after he had been properly Mirandized on three occasions. We agree fully with the judge and reject this argument substantially for the reasons she articulated.

(RE 29, May 1, 2003 Appellate Division Opinion at pp. 10-12).

Locust's claim essentially asserts a Fourth Amendment violation. A Fourth Amendment claim must be assessed by reference to the Supreme Court's decision in Stone v. Powell, 428 U.S. 465 (1976), which precludes habeas review of Fourth Amendment claims that have been litigated in state court.

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal and the substantial societal costs of application of the rule persist with special force.

Stone v. Powell, 428 U.S. at 494-95. However, if the state does not provide any corrective process to redress alleged Fourth Amendment violations, or where the state does offer a corrective process and defendant is precluded from using it, federal habeas review may be warranted. Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977), cert. denied, 434 U.S. 1038 (1978).

Here, it would appear that Locust did raise this Fourth Amendment claim on direct appeal in state court. The state court addressed the merits of petitioner's claim on direct review, but rejected it for the reasons set forth above. Thus, it is fair to say that petitioner's Fourth Amendment claim concerning the procurement of Locust's confession after an allegedly illegal

arrest was fully and fairly litigated at that stage of the appeal process, and habeas review now would be precluded under <u>Stone v. Powell</u>.

However, even if this Court were to assume <u>arguendo</u> that Locust's Fourth Amendment claim is not precluded from habeas review under <u>Stone v. Powell</u> because it was never litigated, this Court also finds that the claim lacks merit.[4]

The Fourth Amendment is applicable to the States through the Fourteenth Amendment. A seizure of a person within the meaning of the Fourth Amendment occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" <u>Kaupp v. Texas</u>, 538 U.S. 626, 629 (2003)(quoting <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991) and <u>Michigan v. Chesternut</u>, 486 U.S. 567, 569 (1988)). The Supreme Court has articulated several examples of circumstances that might indicate a seizure under the Fourth Amendment, even where the person did not attempt to leave, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the

---

[4]   In determining the merit, there is no need to conduct an evidentiary hearing on the matter because the state court record contains the facts necessary in making a determination on any purported Fourth Amendment violation.

officer's request might be compelled." Kaupp 538 U.S. at 630
(quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

In Kaupp, the Supreme Court observed that while certain
seizures may be justified on something less than probable cause
as enunciated in Terry v. Ohio, 392 U.S. 1 (1968), "we have never
'sustained against Fourth Amendment challenge the involuntary
removal of a suspect from his home to a police station and his
detention there for investigative purposes ... absent probable
cause or judicial authorization.'" Kaupp, supra (quoting Hayes v.
Florida, 470 U.S. 811, 815 (1985)). Thus, "involuntary transport
to a police station for questioning is "sufficiently like
arres[t] to invoke the traditional rule that arrests may
constitutionally be made only on probable cause." Id. (quoting
Hayes, 470 U.S. at 816).

In Brown v. Illinois, 422 U.S. 590 (1975), the Supreme Court
held that a confession obtained through custodial interrogation
after an illegal arrest should be excluded unless intervening
events break the causal connection between the illegal arrest and
the confession so that the confession is "sufficiently an act of
free will to purge the primary taint" of the illegal arrest. 422
U.S. at 602. The Court observed that:

> [i]f Miranda warnings, by themselves, were held to attenuate
> the taint of an unconstitutional arrest, regardless of how
> wanton and purposeful the Fourth Amendment violation, the
> effect of the exclusionary rule would be substantially
> diluted. See Davis v. Mississippi, 394 U.S. 721, 726-727,
> 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969). Arrests made
> without warrant or without probable cause, for questioning

> or 'investigation,' would be encouraged by the knowledge
> that evidence derived therefrom could well be made
> admissible at trial by the simple expedient of giving
> <u>Miranda</u> warnings.  Any incentive to avoid Fourth Amendment
> violations would be eviscerated by making the warnings, in
> effect, a 'cure-all,' and the constitutional guarantee
> against unlawful searches and seizures could be said to be
> reduced to 'a form of words.'   <u>See</u> <u>Mapp v. Ohio</u>, 367 U.S.
> [643] at 648, 81 S.Ct. [1684] at 1687.

<u>Brown</u>, 422 U.S. at 602-03.

The Court further held that the giving of <u>Miranda</u> warnings,

although an important factor, is not the only factor to be

considered in determining whether the confession was obtained by

exploitation of an illegal arrest.  The voluntariness of the

statement is a threshold requirement, but the court must consider

the temporal proximity of the arrest and the confession, the

presence of intervening circumstances, and the "purpose and

flagrancy of the official misconduct."  <u>Brown</u>, 422 U.S. at 603-

04.

Similarly, the Supreme Court held in <u>Dunaway v. New York</u>,

442 U.S. 200 (1979):

> "[T]o argue that the Fourth Amendment does not apply to the
> investigatory stage is fundamentally to misconceive the
> purposes of the Fourth Amendment.  Investigatory seizures
> would subject unlimited numbers of innocent persons to the
> harassment and ignominy incident to involuntary detention.
> Nothing is more clear than the Fourth Amendment was meant to
> prevent wholesale intrusions upon the personal security of
> our citizenry, whether these intrusions be termed 'arrests'
> or 'investigatory detentions.'" [<u>Davis v. Mississippi</u>, 394
> U.S. 721, 726-27 (1969)].
>     .  .  .
>
> <u>Brown v. Illinois</u>, [422 U.S. 590 (1975)], similarly
> disapproved arrests made for "investigatory" purposes on
> less than probable cause.  Although Brown's arrest had more

30

of the trappings of a technical formal arrest than petitioner's, such differences in form must not be exalted over substance.  Once in the police station, Brown was taken to an interrogation room, and his experience was indistinguishable from petitioner's.  Our condemnation of the police conduct in <u>Brown</u> fits equally the police conduct in this case:

"The impropriety of the arrest was obvious; awareness of the fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' ...  The arrest, both in design and in execution, was investigatory.  The detectives embarked upon this expedition for evidence in the hope that something might turn up." [<u>Brown v. Illinois</u>, 422 U.S. at 605].

These passages from <u>Davis</u> and <u>Brown</u> reflect the conclusion that detention for custodial interrogation - regardless of its label - intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest.

<u>Dunaway v. New York</u>, 442 U.S. 200, 215-16 (1979).

In yet another case, <u>Taylor v. Alabama</u>, 457 U.S. 687 (1982), the Supreme Court held that a confession obtained through a custodial interrogation of the petitioner after he had been illegally arrested without a warrant or probable cause should have been suppressed.  The Court found that the intervening events did not break the causal connection between the arrest and the confession.  Specifically, the Court rejected the State's argument that petitioner had been given <u>Miranda</u> warnings three times, based on its rulings in <u>Brown</u> and <u>Dunaway</u>.  The Court also found that the six hours between petitioner's arrest and confession and his visit with his girlfriend and male companion for five to ten minutes outside the interrogation room was not

31

sufficient to constitute an intervening event that would have contributed to petitioner's ability to objectively consider his options and exercise his free will in giving a confession. Further, the fact that an arrest warrant was filed, based on a comparison of fingerprints, did not remove the taint because the initial fingerprints were themselves the fruit of the illegal arrest and were used to extract the confession. Finally, the Court found that the lack of flagrant or purposeful police conduct did not cure the illegality of the initial arrest. The Supreme Court expressly declined to adopt a "good faith" exception to the exclusionary rule. Taylor, 457 U.S. at 691-93.

In this case, the trial court ruled that Locust's custodial interrogation did not constitute a seizure without probable cause. The trial court found that while the police did not formally arrest petitioner until 8:30 p.m., Locust's knowledge of the victim, his initial denial of his involvement, his subsequent lies and evasions, and the bloodstained clothes would have given the police probable cause to have arrested Locust before his confession.

Moreover, the trial court concluded that, even if Locust's presence at police headquarters could be construed as an unlawful arrest, Locust's confession was "ultimately an act of free will and any taint purged by intervening events." (RE29). The trial judge had observed that petitioner was not handcuffed or otherwise physically restrained. The police did not engage in

32

any unlawful or reprehensible conduct in their interrogation of
Locust. Indeed, Locust made his admission not after being
confronted with the inconsistencies between his statements and
his girlfriends, or the supposed proof of blood on his clothes,
but after the police detective stated that the he knew Locust did
it and wanted to know why because Locust and the victim were
friendly and the victim should not have died the way he did.
(RE29 at pg. 6).

Finally, this Court finds Locust's claim fails on
attenuation grounds. In this regard, the relevant constitutional
question becomes "whether the connection between the lawless
conduct of the police and the discovery of the challenged
evidence has become so attenuated as to dissipate the taint."
United States v. Ceccolini, 435 U.S. 268, 273-74 (1978). As
set forth above, the Supreme Court delineated four factors
relevant to an attenuation analysis: (1) the administration of
Miranda warnings; (2) "[t]he temporal proximity of the arrest and
the confession; (3) "the presence of intervening circumstances";
and (4) "particularly, the purpose and flagrancy of the official
misconduct." Brown, 422 U.S. at 603-04.

Here, the police administered Miranda warnings three times.
There also is no evidence that the police conducted the
interrogation in an unconstitutional manner. The police did not
physically abuse or mistreat petitioner. Locust was given
several breaks, and was offered food and drinks during the

33

interrogation process.  There was a significant gap of more than 8 hours from when Locust arrived at the police station and when he ultimately gave his confession at about 8:30 p.m.  Locust was given dinner before he was arrested and gave his formal statement.

In contrast, Locust argues that he was kept barefoot and he was tricked by "official-looking scientific evidence."  The record and testimony confirms, however, that Locust was without his shoes for less than an hour.  Such a short period of time without other onerous conditions does not constitute an unreasonable form of physical coercion capable of overcoming petitioner's free will.  Moreover, a trick or misrepresentation by the police will not, on its own, invalidate an otherwise voluntary confession.  See Frazier v. Cupp, 394 U.S. 731 (1969)(confession held admissible where the police falsely informed the defendant that the co-defendant had confessed); Miller v. Fenton, 796 F.2d 598, 609 (3d Cir. 1986)(a police misrepresentation of fact does not per se render a confession involuntary), cert. denied, 479 U.S. 989 (1986); United States ex rel. v. Hall v. Director, 578 F.2d 194 (7th Cir.), cert denied, 439 U.S. 959 (1978)(affirming district court's conclusion that the effects on defendant of misstatements by police did not render his confession involuntary); Henderson v. Hendricks, 2005 WL 3406434, *8 (D.N.J. Dec. 13, 2005); Swain v. Beyer, 1988 WL 52249 (D.N.J. May 5, 1988).

Therefore, this Court finds that any taint from the seizure
of petitioner for questioning was sufficiently purged based on
the factors as discussed above.  The Fourth Amendment claim is
without merit and will be denied.

   3.  *Petitioner's Will Was Not Overborne*

Locust also argues that his confession should have been
suppressed because his free will was overborne and his statement
was not given voluntarily, in violation of the Fifth Amendment.
Locust raised this argument on direct appeal, insisting that the
record shows that he was exhausted, hungry, impaired and
frightened at the time he made his admissions.  Furthermore, he
claims that Captain George's misrepresentation about blood being
found on petitioner's clothes was "flagrantly deceptive conduct"
that had the capacity to overbear his will.

   The  Appellate Division rejected Locust's claim.  The court
found:

> "A suspect's waiver of his [or her] Fifth Amendment right to
> silence is valid only if made 'voluntarily, knowingly and
> intelligently.'" State v. Adams, 127 N.J. 438, 447
> (1992)(quoting Miranda []).  To determine voluntariness, a
> court must assess the totality of the circumstances
> surrounding the giving of the statement.  State v. Roach,
> 146 N.J. 208, 227, cert. denied, 519 U.S. 1021 (1996).
>
> "The fact that the police lie to a suspect does not, by
> itself, render a confession involuntary." State v.
> Galloway, 133 N.J. 631, 655 (1993).  "[U]se of a
> psychologically-oriented technique during questioning is not
> inherently coercive[;] ... [t]he real issue is whether the
> person's decision to confess results from a change of mind
> rather than from an overbearing of the suspect's will." Id.
> at 654-55.  In order to render a confession involuntary, the

35

suspect must have been subjected to "very substantial"
psychological pressure. Id. at 656.

> That is not what happened here. Defendant, who had normal
> intelligence, had prior experience with the police and fully
> comprehended his situation, as evidenced by his initial
> lies. Additionally, there was testimony on which the trial
> judge was fully entitled to rely, indicating that defendant
> was provided with food, drink, and cigarettes while at the
> station, that he appeared alert, that he was Mirandized at
> least three times, and that he was not mistreated in any
> way. The lie by Captain George did not have the capacity to
> overbear defendant's will. It seems more likely that
> defendant simply realized that he was not going to get away
> with the crime and decided to unburden himself. Therefore,
> we see no basis to suppress defendant's inculpatory
> statement.

(RE29 at pp. 12-13).

Pursuant to the Fifth Amendment right against self-

incrimination and the Due Process Clause of the Fourteenth

Amendment, a confession must be voluntary to be admitted into

evidence. See Dickerson v. United States, 530 U.S. 428, 433

(2000). Miranda provides that the accused may waive his rights,

but must do so "voluntarily, knowingly and intelligently".

Miranda, 384 U.S. at 475.

> To summarize, we hold that when an individual is taken
> into custody or otherwise deprived of his freedom by
> the authorities in any significant way and is subjected
> to questioning, the privilege against self-
> incrimination is jeopardized. Procedural safeguards
> must be employed to protect the privilege and unless
> other fully effective means are adopted to notify the
> person of his right of silence and to assure that the
> exercise of the right will be scrupulously honored, the
> following measures are required. He must be warned
> prior to any questioning that he has the right to
> remain silent, that anything he says can be used
> against him in a court of law, that he has the right to
> the presence of an attorney, and that if he cannot
> afford an attorney one will be appointed for him prior
> to any questioning if he so desires. Opportunity to

> exercise these rights must be afforded to him
> throughout the interrogation.  After such warnings have
> been given, and such opportunity afforded him, the
> individual may knowingly and intelligently waive these
> rights and agree to answer questions or make a
> statement.  But unless and until such warnings and
> waiver are demonstrated by the prosecution at trial, no
> evidence obtained as a result of interrogation can be
> used against him.

Miranda, 384 U.S. at 478-79.  The Miranda warnings are a

constitutional requirement.  Dickerson, 530 U.S. at 444.  "The

requirement that Miranda warnings be given does not, of course,

dispense with the voluntariness inquiry.  But ... '[c]ases in

which a defendant can make a colorable argument that a self-

incriminating statement was 'compelled' despite the fact that the

law enforcement authorities adhered to the dictates of Miranda

are rare.'"  Dickerson, 530 U.S. at 444.

"[T]he ultimate issue of 'voluntariness' is a legal question

requiring independent federal determination," and is thus not

subject to the § 2254(d) presumption of correctness.  Miller v.

Fenton, 474 U.S. 104, 109-110 (1985).

> The Supreme Court has made clear that a statement is
> involuntary when the suspect's "will was overborne in
> such a way as to render his confession the product of
> coercion." Arizona v. Fulminante, 499 U.S. 279, 288,
> 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining
> whether a statement is voluntary, Supreme Court
> precedent requires consideration of "the totality of
> all the surrounding circumstances--both the
> characteristics of the accused and the details of the
> interrogation." Dickerson v. United States, 530 U.S.
> 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)
> (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226,
> 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These
> surrounding circumstances include "not only the crucial
> element of police coercion, Colorado v. Connelly, 479
> U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986),"

> but may also include "the length of the interrogation,
> its location, its continuity, the defendant's maturity,
> education, physical condition, and mental health."
> <u>Withrow v. Williams</u>, 507 U.S. 680, 693, 113 S.Ct. 1745,
> 123 L.Ed.2d 407 (1993) (some internal citations
> omitted).

<u>Lam v. Kelchner</u>, 304 F.3d 256, 264 (3d Cir. 2002).  "[S]ubsidiary

questions, such as the length and circumstances of the

interrogation, the defendant's prior experience with the legal

process, and familiarity with the <u>Miranda</u> warnings, often require

the resolution of conflicting testimony of police and defendant.

The law is therefore clear that state-court findings on such

matters are conclusive on the habeas court if fairly supported in

the record and if the other circumstances enumerated in § 2254(d)

are inapplicable."  <u>Dickerson</u>, 474 U.S. at 117.

In determining whether there has been a valid waiver of

<u>Miranda</u> rights, a court must conduct a two-part inquiry under a

totality of the circumstances standard.  <u>Moran v. Burbine</u>, 475

U.S. 412, 421 (1986).  First, the court looks to the

voluntariness of the statement, and whether the waiver was freely

and deliberately given as opposed to being obtained by coercion,

intimidation, or deception.  <u>Id</u>.  Second, the court must consider

whether the waiver was "knowingly and intelligently" made, that

is, whether the accused was fully aware "both of the nature of

the right being abandoned and the consequences of the decision to

abandon it."  <u>Id</u>.

The "totality of the circumstances" approach is the clearly

established federal standard applied to determine whether there

38

has been a voluntary waiver of <u>Miranda</u> rights.  A court must take into account "both the characteristics of the accused and the details of the interrogation."  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).  This approach includes the evaluation of the subject's age, education, experience, background, and intelligence, and whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights, the length of detention, the repeated and prolonged nature of questioning, and the use of physical punishment such as the deprivation of food or sleep.[5]  <u>Id</u>.; <u>see also</u> <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979); <u>United States v. Swint</u>, 15 F.3d 286, 289 (3d Cir. 1994). It looks to the person's familiarity with the criminal justice system, the timing of the <u>Miranda</u> warnings and the statement given, and the length and nature of the interrogation and the accompanying detention.  <u>See</u> <u>United States v. Velasquez</u>, 885 F.2d 1076, 1086 (3d Cir. 1989), <u>cert</u>. <u>denied</u>, 494 U.S. 1017 (1990); <u>United States v. Vasquez</u>, 889 F. Supp. 171, 177 (M.D.Pa. 1995). <u>See also</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 124 S.Ct. 2140, 2151 (2004)(the characteristics of the defendant can include the

---

[5]   In determining the voluntariness of the confession, New Jersey state courts have traditionally assessed the totality of the circumstances surrounding the arrest and interrogation, including such factors as the accused's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment of mental exhaustion was involved."  <u>State v. Miller</u>, 76 N.J. 392, 402 (1978); <u>see also</u> <u>State v. Presha</u>, 163 N.J. 304, 313 (2000).

defendant's age, education, and intelligence, as well as his prior experience with law enforcement).

Further, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986); see also Arizona v. Fulminante, 499 U.S. 279, 288 (1991)(a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion"); Lam, 304 F.3d at 264. Absent police overreaching, which is causally related to the confession, "there is simply no basis for concluding that a state actor has deprived a criminal defendant of due process of law." Connelly, 479 U.S. at 164. Thus, beyond the necessary and crucial element of police coercion, courts look to both the characteristics of the accused and the circumstances of the interrogation in considering whether a confession is voluntary. See, e.g., Withrow v. Williams, 507 U.S. 680, 693-94 (1993)(concluding that the voluntariness of the confession depends upon the totality of circumstances, including police coercion, length and place of interrogation, the accused's maturity, education, physical condition, intelligence, and mental health, as well as 'the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation"); Schneckloth, 412 U.S. at 226 (the voluntariness of a statement may often depend on

whether the accused's will was overborne, a question that logically turns on the characteristics of the accused). The government "need prove waiver only by a preponderance of the evidence." Connelly, 479 U.S. at 168.

This Court has carefully reviewed the record and finds that the totality of the circumstances in this case clearly weigh in favor of voluntariness, as determined by the state courts. First, there is no evidence of coercive conduct on the part of the police. Second, as fully discussed by the Appellate Division on direct appeal, as set forth above, the trial court determined that petitioner's confession was knowingly, intelligently and voluntarily made.

Having reviewed the relevant state court record, in particular the testimony and evidence adduced at the Miranda hearing, this Court finds that petitioner's statement was voluntarily and intelligently given.

Locust was given Miranda warnings on three occasions and stated he understood them and waived them accordingly before he confessed. His statement was given after he had eaten dinner. There was no evidence that petitioner was deprived of food, sleep, or other physical needs that would otherwise serve to overbear a person's will. Nor is there any evidence in the record to show that the police used unnecessary or overbearing psychological tactics to extract a confession from petitioner.

There also were no factors concerning petitioner's age and education, which would suggest that he did not understand his <u>Miranda</u> rights or the consequences of waiving those rights. Locust alleges that he was impaired but the police testimony shows that he was alert and responsive. Further, this Court agrees with the state court that there was no overreaching or objectively coercive police conduct that would have overborne petitioner's will under the circumstances here to make petitioner's confession involuntary. As stated above, there were no physical punishments inflicted on petitioner - he was not deprived of sleep and food and he was not physically threatened or harmed. <u>Miranda</u> warnings were given and petitioner waived those rights voluntarily and knowingly.

Consequently, after careful review of the record, this Court cannot conclude that the determination of the trial court in admitting petitioner's confession resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. <u>Williams v. Taylor</u>, <u>supra</u>. The state courts applied the correct law and facts in reaching its determination that there was no <u>Miranda</u> violation, and that the statement was voluntarily, knowingly and intelligently given. Petitioner has failed to demonstrate that the state court opinion, when evaluated objectively and on the

merits, resulted in an outcome that cannot be reasonably justified. Matteo, 171 F.3d at 891. Therefore, the Court will deny federal habeas relief on this claim because the alleged violation of petitioner's Fifth and Fourteenth Amendment rights is substantively meritless.

B.  Trial Court Erred in Denying Expert Testimony at Trial

Locust next argues that the trial court erred in denying petitioner to add an expert witness to the witness list on the fourth day of trial. Locust claims that the expert would have testified that Locust was under the influence of cocaine during his custodial interrogation to contest the police testimony that Locust appeared to be normal at the time his statements were made.

Generally, issues as to the admissibility of evidence are questions of state law and not subject for federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 68 (1991); Johnson v. Rosemeyer, 117 F.3d 104, 112-15 (3d Cir. 1997). See also Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir.), cert. denied, 534 U.S. 973 (2001). Federal courts must afford the states deference in its determinations regarding evidence and procedure. See Crane v. Kentucky, 476 U.S. 683, 690 (1986). It is well-established that "a state court's misapplication of its own law does not generally raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of

43

constitutional dimension." Smith v. Horn, 120 F.3d 400, 414 (3d
Cir. 1997)(citations omitted), cert. denied, 522 U.S. 1109
(1998).

However, evidentiary rulings may violate due process when
the petitioner "was denied fundamental fairness at trial."
Hutchins v. Hundley, 1991 WL 167036 at *4 (D.N.J. Aug. 22,
1991)(Wolin, J.)(citations omitted); see also Kontakis v. Beyer,
19 F.3d 110, 120 (3d Cir. 1994), cert. denied, 513 U.S. 881
(1994); Lisenba v. California, 314 U.S. 219, 228, 236
(1941)(holding that state court's evidentiary rulings may form
the basis for habeas relief when they "so infused the trial with
unfairness as to deny due process of law").

The appropriate inquiry is "whether the claimed error of law
is a fundamental defect which inherently results in a complete
miscarriage of justice or in an omission inconsistent with the
rudimentary demands of fair procedure." Hutchins, 1991 WL 167036
at *4 (citing United States v. De Luca, 889 F.2d 503, 506 (3d
Cir. 1989), cert. denied, 496 U.S. 939 (1990))(other citations
omitted). The Supreme Court has further stated that "an
otherwise valid conviction should not be set aside if the
reviewing court may confidently say on the whole record that the
constitutional error was harmless beyond a reasonable doubt."
Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). An error is
not harmless if "it aborts the basic trial process or denies it

44

altogether." <u>Hutchins</u>, 1991 WL 167036 at *5 (citing <u>Rose v. Clark</u>, 478 U.S. 570, 578 n.6 (1986)).

Here, the trial court denied petitioner's request to add an expert in the middle of trial because Locust had committed a discovery violation. In particular, Locust had failed to comply with <u>N.J. Ct.R.</u> 3:13-3(d)(5), which allows a prosecutor to apply to have a defense expert barred from testimony where the expert's report is not provided to the State within thirty days of trial. This Court finds that the trial court's procedural ruling did not unfairly prejudice Locust. Moreover, it is plain that the issue of petitioner's alleged impairment during the custodial interrogation was not a new contention, and petitioner had ample time before trial to procure an expert witness in this regard in accordance with state court discovery rules.

Consequently, the trial court's evidentiary ruling did not amount to an error of constitutional dimension. Nor has Locust shown that the trial process was fundamentally unfair. Further, Locust has not demonstrated, as required under 28 U.S.C. § 2254(d), that the actions of the state court in this regard resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts.

C.   Ineffective Assistance of Counsel Claims

Finally, Locust asserts numerous claims of ineffective assistance of counsel in violation of his Sixth Amendment rights. The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001).  To meet this first prong of deficient performance, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at 690.  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance.  Id.

If able to demonstrate deficient performance by counsel, then the petitioner must show prejudice, i.e., there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."

46

Id. at 694.   As the Strickland Court explained, "[a]ttorney

errors come in an infinite variety and are as likely to be

utterly harmless in a particular case as they are to be

prejudicial." Id. at 693.   Thus, the Court held that prejudice

is shown if "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding

would have been different.   A reasonable probability is a

probability sufficient to undermine confidence in the outcome."

Id. at 694.   The reviewing court must evaluate the effect of any

errors in light of the totality of the evidence. See id. at 695-

96.   Thus, the petitioner must establish both deficient

performance and resulting prejudice in order to state an

ineffective assistance of counsel claim. See id. at 697; see

also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.   However,

the Supreme Court further instructed that a district court need

not address both components of an ineffective assistance claim

"if the defendant makes an insufficient showing on one."

Strickland, 466 U.S. at 697.   "If it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should

be followed." Id.

Locust raised his ineffective assistance of counsel claims

in his state PCR proceedings.   The state PCR court found that

many of the claims were procedurally barred as previously

adjudicated on direct appeal. In pertinent part, the state PCR court noted:

> In this case, the Appellate Division has already affirmed this Court's rulings with regard to the issue set forth in this motion for post conviction relief. The defendant is using the argument of ineffective assistance of counsel to raise arguments which already have been defeated both at this level and at the appellate level.
>
> The defendant argues that his counsel never argued that his confession was induced without consent or voluntariness on his part and although under the guise of an ineffective assistance of counsel motion, the motion relies on adjudication of the issues which have already been decided. Both trial and appellate counsel have zealously advocated defendant's position that his confession was not voluntary.
>
> Rule 3:22-4 instructs that any issue that could have been raised on direct appeal but was not is not a viable ground for post conviction relief unless one of three exceptions is established. And that is that the issues could not have reasonably been raised in a prior proceeding, enforcement of the bar would occasion fundamental injustice and denial of relief would result in a constitutional violation.
>
> In this case none of those exceptions apply. The defendant's voluntariness argument was raised, litigated and rejected. The Appellate Division considered his claim that he was left barefoot. In affirming the decision on this, the Appellate Court spoke on this very issue, noting that the police were unsure if the defendant had been given shoes. This motion was heard with a lot of evidence, four days, and the motion was denied. The Appellate Division affirmed.
>
> The balance of defendant's claims also have been litigated. The defendant argued that trial counsel failed to raise that prior to his confession he was forced to stand barefoot on the cold floor. This argument was noted in the Appellate Division opinion. It stated that the police lying to a defendant does not render the confession involuntary. So the arguments that his confession was tricked out of him was raised and litigated.
>
> The defendant also argues that counsel never raised the issue that his forced confession was retaliation due to his mother's lawsuit. That the confession was held to be voluntary, again, and the issue was fully explored by trial

counsel on cross examination of many of the State's witnesses and that included Detectives Coleman and Seitz.

Also the defendant argues that it was never brought to the jury that there was DNA which could not have originated from him or the victim found on his clothes and therefore the police must have planted it there. However, again, this was raised and litigated before trial. So the argument is both without any merit and should have been addressed on direct appeal. There was cross examination of Jackie Higgins. So it shows that this argument is not probative.

And I find that the defendant is not entitled to a hearing because his motion is procedurally barred for raising issues which have previously been raised and litigated at the trial and on appeal. The defendant again talks about ineffective assistance of counsel, which is really the same argument. It's constantly the same argument here. He uses the same discussions.

For a claim of ineffective assistance of counsel, our Court has adopted the standard of review outlined in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In order for a claim of ineffective assistance of counsel to succeed the defendant must satisfy a two prong test. First, he must show that the attorney's performance did not meet an objective standard of reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.

So in this case I find that the defendant has failed to meet both of these prongs. The defendant's mere second guessing of strategic decisions made during the suppression hearing and the trial, that appellate counsel did not consider worthy of notice during direct appeal, does not satisfy this prong.

It is clear from review of the facts and a review of my notes of the trial and my review of the transcripts of the trial that the defense counsel really had a strategically mapped out defense. The defendant participated in this. It's obvious. The defense counsel presented a presentation. He called witnesses.

He cross examined rigorously as to many facts that could shed a negative light on the State's witnesses. Again during the case in chief counsel he brought those facts back out on cross and tried to establish another perpetrator. So he did what he had to do. This was a sound and reasonable strategy, especially in light of the overwhelming evidence.

Besides the confession, there was overwhelming evidence that the defendant was guilty in this.

I'll just note a few things. Counsel cross examined Veronica Smothers. She was the sister of Michael Cordiman (phonetic) and he elicited facts that Mr. Cordiman and the defendant both had drug problems, that they consumed drugs together. And that, I think, could have raised suspicions about the fact that Cordiman may have been the perpetrator in this event. He elicited the fact that Cordiman frequented Mr. Amison's residence and obtained money from him, as well as the defendant.

He cross examined Det. Ferguson about the fingerprint evidence. He minimized the blood spatter evidence in anticipation of the defendant's testimony. He also cross examined Sgt. Donovan and Det. Cassidy.

He cross examined other witnesses, which set a foundation for his cross examination of Brian Pisano. And there is really nothing before me to show that he didn't vigorously investigate anything here. Just because Brian Pisano ultimately decided to testify for the State doesn't mean that defense counsel did anything wrong. So I think that that argument is specious.

Also the defendant's counsel brought out alleged police practices that may have been abusive or coercive. And I rejected them and they were brought out again at trial and the jury rejected them. So all those things were brought out. When he cross examined Brian Pisano he attacked his credibility. He attempted to portray him as the killer. So defense counsel did exactly what he had to do in this case.

Also the fact that when he presented his case in chief he called various witnesses and they were called to try to establish the fact that Pisano might have committed the crime. The jury rejected that defense. They heard those witnesses and the jury rejected that.

Also the defendant testified himself. He testified as to what he did, what he said. He testified in front of me. He testified in front of the jury. He told his story on two occasions.

There's also the issue of the fact that trial counsel claims that counsel failed to provide effective assistance of counsel because a member of the jury was a former employee of the prosecutor's office. There was a voir dire as to that. That juror was questioned. She said that she had

worked for the prosecutor's office 22 years before that. I think it was only for a short period of time.

She sent out subpoenas. I think that was the issue, that she sent out subpoenas for the prosecutor's office. She worked there approximately 22 years before this trial. And I asked her whether that would impair her ability to be fair and impartial in this case and she said, no, she could be fair and impartial. There was no reason to keep her off the jury.

Also counsel did use his challenges. He challenged numerous jurors. They were challenged. They were taken from the jury. So he did not rely on the first fourteen people that were impaneled.

As far as the claim that counsel allowed an all white jury, maybe that is the case. Maybe there was an all white jury, but there's nothing -- we can't go any place from there. There was no showing that because there was an all white jury it made any difference in the decision of the jury.

So I find besides being procedurally barred, if I were to consider all the facts in this case and all the argument that counsel was ineffective, I find that he was not ineffective. I also find that the accumulation of errors certainly did not creep into this case, that there was no accumulation of errors.

(RE38, November 18, 2005 PCR Transcript, 17:5-23:24).

Locust appealed from the denial of his PCR petition. The

Appellate Division held:

We have considered each of these issues in light of the record, the applicable law and the arguments of counsel, and we are satisfied none of them is of sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We affirm therefore substantially for the reasons stated in Judge Del Bueno Cleary's thoughtful and comprehensive oral opinion of November 18, 2005. We add only the following comments.

Apart from lacking substantive merit, defendant's arguments are procedurally barred as already adjudicated, Rule 3:22-5, and to the extent not heretofore decided, as capable of being raised and therefore now precluded from review, Rule 3:22-4.

Defendant does not raise any issue based on a constitutional principle established by our courts after his conviction and subject to retroactive application. See State v. Nash, 64 N.J. 464, 474-75 (1974). He does not make claims based on testimony outside of the trial record that could not have been raised on direct appeal. See State v. Sloan, 226 N.J. Super. 605, 612 (App. Div.), certif. denied, 113 N.J. 647 (1988). Additionally, he does not challenge the appellate proceedings themselves. See State v. Morrison, 215 N. J. Super. 540, 544-45 (App. Div.), certif. denied, 107 N.J. 642 (1987).

Although defendant asserts a claim of constitutional dimension, Rule 3:22-4(c), in order to come within this exception, defendant must show that his "constitutional rights were seriously infringed during the conviction proceedings." State v. Mitchell, 126 N.J. at 585-86 (1992(. Defendant may not evade the procedural bars of Rule 3:22-4 by "[c]loaking the claim in constitutional language[.]" Id. at 586. A court must closely scrutinize defendant's issues to discover if a constitutional right is truly implicated. Ibid. Under such scrutiny, defendant fails to implicate any constitutional right. Ibid.

Finally, the enforcement of the procedural bar of Rule 3:22-4 will not result in "fundamental injustice." Id. at 587. There is no fundamental injustice where the court has provided a fair proceeding "leading to a just outcome." Ibid. Defendant has failed to assert any facts that meet the definition of "fundamental injustice." Because defendant had more than ample opportunity on direct appeal to assert all of the claims he now raises, we are satisfied that Judge Del Bueno Cleary correctly determined defendant's claims as procedurally barred.

Although Judge Del Bueno Cleary correctly found that defendant's PCR petition was procedurally barred, she nevertheless addressed defendant's allegations of ineffective assistance of trial counsel on the merits. Before doing so, she rejected defendant's contention that he was entitled to an evidentiary hearing. The judge found that defendant failed to establish a prima facie case of ineffective assistance of counsel, a condition precedent to entitlement to an evidentiary hearing. State v. Preciose, 129 N.J. 451, 462-64 (1992). Thus, the judge thoroughly reviewed each of defendant's allegations of ineffectiveness against the legal requirements to prove an ineffectiveness claim and determined that defendant had not shown that his counsel performed below the objective standard of reasonableness set forth in Strickland, supra, and State v.

> Fritz, 105 N.J. 42 (1987).  The judge correctly concluded
> that defendant failed to establish either that the
> performance of his counsel was deficient or that he was
> prejudiced as a result of errors in his trial and appellate
> counsel's performance.

(RE44, August 10, 2007 Appellate Division Opinion, at pp. 6-7).

Here, Locust asserts first that trial counsel was
ineffective in that he failed to properly investigate or
adequately prepare for trial.  Namely, he contends that: (1)
Trial counsel failed to object to an all-white jury; (2) Trial
counsel was ineffective for failing to object about a juror who
once worked for the Prosecutor's Office; (3) Trial counsel was
ineffective for not raising at the Miranda hearing that the
detectives kept the petitioner barefooted on a cold floor prior
to the confession; (4) Trial counsel was ineffective for ignoring
the petitioner when he was told by the petitioner that the
detectives are lying about seeing blood on his clothes; (5) Trial
counsel was ineffective for failing to argue the possibility of a
setup by Detective Seitz and that the victim's DNA could have
been planted on the petitioner's clothes by the detectives
because of the lawsuit against the Long Branch police by the
petitioner's mother; (6) Trial counsel was ineffective for
failing to raise that there was DNA on the petitioner's clothes
which could not have originated from the petitioner or the victim
according to the report by the State's own DNA expert; and (7)
Trial counsel was ineffective for failing to timely investigate
Brian Pisano and Barbara Latham.  In his amended petition, Locust

also asserts that (8) Trial counsel was ineffective for failing to file a motion to suppress clothes which were the product of an illegal search and seizure; (9) Trial counsel was ineffective for his failure to object to petitioner's clothes being admitted into evidence; (10) Trial counsel was ineffective for failing to investigate why the interrogation and the waiving of his rights were not video-taped; (11) Trial counsel was ineffective when he failed to argue that as a routine practice the police trick people into signing pre-typed statements with falsified words included in the confession that falsely indicates that the signatory read the statement, which is what happened in petitioner's case; (12) Trial counsel was ineffective for failing to put a motion to have the indictment dismissed because it was based on lies and twisted facts presented to the grand jury; and (13) Trial counsel was ineffective for his failure to hire expert witnesses to counter the State's expert witnesses where the State introduced their own psychiatric and scientific expert.

As set forth above, all of these claims were raised by Locust in his state PCR proceedings. More importantly, each claim was examined and rejected by the state courts. This Court has carefully reviewed the state court record and finds no error in the state court rulings. In particular, addressing each claim individually, the Court finds as follows:

54

1. *Failure to Object to an All White Jury*

The state PCR court rejected this claim, essentially finding that Locust failed to show prejudice. The court found: "There was no showing that because there was an all white jury it made a difference in the decision of the jury. (RE38, November 18, 2005 PCR Transcript at 23:12-17).

The State further argues that the composition of the jury is not what constitutes error. A defendant has no right to a petit jury composed in whole or in part of persons of his own race. Batson v. Kentucky, 476 U.S. 79, 85 (1986). Only purposeful racial discrimination in jury selection violates a defendant's right to equal protection. Batson, 476 U.S. at 86-89. Here, the state court record plainly shows that prosecutor did not use any peremptory challenges to intentionally exclude non-white jurors. Consequently, this Court finds that Locust has failed to prove a Batson claim, and this claim will be denied for lack of merit.

2. *Failure to Object to Juror Who Worked for Prosecutor*

Locust also asserts that his trial counsel was ineffective for failing to object to a juror who had worked for the prosecutor's office. He raised this claim in his state PCR proceedings and the PCR court rejected it. The PCR court observed that a voir dire as to the juror's former employment with the prosecutor's office was conducted. The juror stated that she merely sent out subpoenas and that she had worked there for a short period of time 22 years before the commencement of

trial.  The trial court asked the juror if her former employment would impair her ability to be fair and impartial and she responded "no."  Therefore, the court found no reason to dismiss the juror.

It is clear from the state court record that trial counsel used his peremptory challenges more strategically to strike other jurors who he deemed more likely to influence a negative outcome than the former employee of the prosecutor's office who had sent out subpoenas more than 22 years prior to trial.  Locust fails to provide any evidence or argument that but for striking that juror, he would not have been convicted.

Accordingly, this Court finds no merit to this claim.

3.  *Barefoot Claim*

Locust next asserts that his counsel was ineffective for not raising at the <u>Miranda</u> hearing that the detectives kept petitioner barefoot on a cold floor before his confession.  This claim was raised on direct appeal and was rejected as having no merit on the ground that the short period of time that Locust was barefoot did not affect the voluntariness of his confession.  Therefore, because Locust can not show prejudice, this claim will be denied for lack of merit.

4.  *Blood on Clothes and DNA Claims*

Locust also raises several claims that his trial counsel was ineffective in failing to argue that the detectives allegedly were lying about seeing blood on his clothes, that the DNA could

56

have been planted on Locust's clothes because of an earlier
lawsuit against the Long Branch police by Locust's mother, and
that the DNA could not have originated from petitioner or the
victim according to the State's own forensic report.

The state PCR court rejected these claims as without merit
and because they were raised and litigated at trial and on direct
appeal. The court found that even if the police did lie to
petitioner to trick a confession from him, that did not render
the confession involuntary. The issue was raised and litigated
during the trial proceedings, and the confession was found to be
voluntary. Moreover, trial counsel did conduct a thorough and
vigorous cross examination of many of the State witnesses,
including Detectives Coleman and Seitz. At the Miranda hearing,
and again on cross-examination at trial, defense counsel
questioned Seitz about his knowledge and familiarity with the
lawsuit by Locust's mother against Long Branch police. Counsel
also questioned Ferguson, George, Coleman, Seitz and others at
the Miranda hearing and at trial about the seizure of
petitioner's clothing and shoes, and whether blood was seen on
petitioner's clothing. The State's witness, Jackie Higgins, a
DNA analyst, was thoroughly cross-examined by defense counsel on
the issue of the origin of the DNA samples found on Locust's
clothing articles. None of these cross-examinations produced any
probative evidence to support Locust's claims of bias, that DNA
evidence was planted, or that the outcome of the trial would have

been different.  In short, Locust has failed to prove both error
(because his allegations of counsel's deficiencies are
contradicted by the record) or resulting prejudice on these
claims.  Therefore, these claims will be denied for lack of
merit.

     5.   *Failure to Timely Investigate Pisano and Latham*

     Locust next alleges that trial counsel was ineffective for
failing to timely investigate Brian Pisano and Barbara Latham.
As to Latham, Locust fails to show how Latham's testimony would
have been sufficiently favorable so as to change the outcome at
trial.  In fact, Latham had no personal knowledge of exculpatory
information.  Locust merely told her he did not commit the
murder.  Further, Locust did not show that Latham would have
testified at trial.  Consequently, Locust has failed to show any
resulting prejudice.

     As to Pisano, the record shows that he testified at trial
and that defense counsel thoroughly questioned him on cross-
examination.  Locust does not show how investigating Pisano at an
earlier time would have made the cross-examination effective to
prove petitioner's innocence.  In fact, the trial record shows
that defense counsel vigorously attacked Pisano's credibility on
cross and that defense counsel attempted to portray Pisano as the
killer.  Indeed, the PCR court found that defense counsel's
thorough cross-examinations of other witnesses laid a foundation
for Pisano's cross-examination, and that there was nothing in the

trial record to show that defense counsel "didn't vigorously investigate" Pisano.  The PCR court further ruled that "[j]ust because Brian Pisano ultimately decided to testify for the State doesn't mean that defense counsel did anything wrong." (RE38, November 18, 2005 PCR Transcript, 21:18-22:8).  Therefore, Locust again fails to show error or prejudice on this claim and it must be denied for lack of merit.

Moreover, witness selection is entrusted to counsel's sound judgment.  <u>Government of Virgin Islands v. Weatherwax</u>, 77 F.3d 1425, 1431 (3d Cir.), <u>cert</u>. <u>denied</u>, 519 U.S. 1020 (1996).  "Attorneys are not required to call every witness suggested to them; their expertise leads them to choose only the witnesses likely to assist the case.  Indeed, this is precisely the type of strategic decision which the Court in <u>Strickland</u> held to be protected from second-guessing." <u>United States v. Ciancaglini</u>, 945 F. Supp. 813, 823 (E.D.Pa. 1996).  Petitioner's speculation at best regarding the testimony of Latham and Pisano does not state a cognizable claim under <u>Strickland</u>.

6.  *Failure to File Motion to Suppress Clothing*

In his supplemental claims 1 and 2 of the amended habeas petition, Locust alleges that trial counsel was ineffective for failing to file a motion to suppress his seized clothing or to object to the clothes being admitted into evidence at trial. Essentially, Locust asserts an ineffective assistance of counsel claim based on the failure to have evidence suppressed under the

Fourth Amendment.  To prevail on such a claim, petitioner must prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the outcome of the trial would have been different if the evidence had been excluded. Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Generally, evidence gained through a Fourth Amendment violation may not be used against a defendant at trial.  See Mapp v. Ohio, 367 U.S. 643, 654-55 (1961).  This "exclusionary rule" is a judicially-created remedy to safeguard Fourth Amendment rights by deterring police conduct that violates those rights. See Stone v. Powell, 428 U.S. at 486.

In Stone, the Supreme Court examined the nature of the exclusionary rule, which it characterized as a "judicially created means of effectuating the rights secured by the Fourth Amendment" and balanced its utility as a deterrent against the risk of excluding trustworthy evidence and thus "deflect[ing] the truthfinding process."  Id. at 482, 490.  Finding that, as to collateral review, the costs of the exclusionary rule outweighed the benefits of its application, the Court concluded that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  Id. at 494.

Thus, while the federal courts are not deprived of jurisdiction to hear the claim, they are — for prudential reasons — restricted in their application of the exclusionary rule. See id. at 494 n. 37; see also Marshall v. Hendricks, 307 F.3d 36, 81-82 (3d Cir. 2002), cert. denied, 538 U.S. 911 (2003). "Whether the petitioner actually took advantage of the opportunity is irrelevant; so long as the opportunity was available, the bar against raising the Fourth Amendment claims on collateral review applies." Jackson v. DiGuglielmo, 2006 U.S. Dist. LEXIS 24516, at *6, 2006 WL 1147517 (E.D.Pa. 2006)(citing Cohen v. Gillis, 2004 U.S. Dist. LEXIS 13904 (E.D.Pa. 2004)). Moreover, "[a]n erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the bar." Gilmore v. Marks, 799 F.2d 51, 57 (3d Cir. 1986), cert. denied, 479 U.S. 1041 (1987).

The Court of Appeals for the Third Circuit has recognized that there may be instances in which a full and fair opportunity to litigate was denied in state court. See, e.g., Gilmore, 799 F.2d at 57 (observing that a state's "failure to give at least colorable application of the Fourth Amendment constitutional standard" might amount to a denial of the opportunity for full and fair litigation); Boyd v. Mintz, 631 F.2d 247, 250 (3d Cir. 1980)(assuming, without deciding, that the term "opportunity" simply means providing procedures by which one can litigate a Fourth Amendment claim, and noting that Stone v. Powell does not

preclude federal habeas relief when "'the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process'")(quoting <u>Gates v. Henderson</u>, 568 F.2d 830, 840 (2d Cir. 1977), <u>cert</u>. <u>denied</u>,434 U.S. 1038 (1978))).

Here, Locust has not shown that he was denied a full and fair opportunity to litigate this claim in state court.  The record shows that Locust consented to the seizure of his clothing in writing.  Moreover, defense counsel had argued that the consent was not lawfully obtained because it was conditioned upon his release.  The state courts rejected the claim.  Thus, it would appear that Locust can not show error or prejudice with regard to this claim to satisfy <u>Strickland</u>.

7. *Failure to Investigate Why Interrogation Not Video-Taped*

Locust further argues that his counsel was ineffective in failing to investigate why his interrogation and the waiving of his rights was not video-taped.  The State argues that there is no constitutional requirement that such interviews be recorded. Moreover, at the time Locust was interrogated, there was no New Jersey state law requirement in effect that directed video recordings be made during the custodial interrogations of murder suspects.  This Court agrees.

Accordingly, where Locust has failed to demonstrate attorney error, and has not shown that he would not have been convicted but for counsel's failure to conduct an investigation concerning

the video-taping of his interrogation, this claim will be denied for lack of merit.

8. *Failure to Argue Police Tricked Locust into Confession*

Next, Locust contends that his trial counsel was ineffective for failing to argue that as a routine practice the police trick people into signing pre-typed statements with falsified words included in the confession that falsely indicates that the signatory read the statement. Locust presents no evidence to support his contention that this alleged police practice is routinely conducted, or that it was applied in his case. Indeed, the issue of the knowing and voluntary nature of petitioner's confession has been fully litigated at the <u>Miranda</u> hearing, at trial and on direct appeal. Furthermore, throughout trial, defense counsel cross-examined the police and detective witnesses on the alleged "trickery." And, as stated previously, the Appellate Division held that "the fact that police lie to a suspect does not, by itself, render a confession involuntary." (RE29, pg. 12).

Therefore, because this issue as to police trickery was fully litigated, as set forth above, this Court finds no deficiency of performance by defense counsel, and petitioner has shown no prejudice on this claim to merit habeas relief.

9. *Failure to File Motion to Dismiss Indictment*

Locust also argues that his trial counsel was ineffective for failing to file a motion to dismiss the indictment because it

63

was based on lies and "twisted facts" presented to the grand
jury.

Generally, deficiencies in state grand jury proceedings are
not grounds for relief under § 2254.  See Lopez v. Riley, 865
F.2d 30, 32 (2d Cir. 1989).  This conclusion flows from United
States v. Mechanik, 475 U.S. 66 (1986), in which the Supreme
Court held that a violation of Fed.R.Crim.P. 6(d) (which governs
who may be present while the grand jury is in session,
deliberating, or voting), discovered only at trial, did not
justify relief after the petit jury had rendered its verdict.

> [T]he petit jury's subsequent guilty verdict means not
> only that there was probable cause to believe that the
> defendants were guilty as charged, but also that they
> are in fact guilty as charged beyond a reasonable
> doubt.  Measured by the petit jury's verdict, then, any
> error in the grand jury proceedings connected with the
> charging decision was harmless beyond a reasonable
> doubt.

Mechanik, 475 U.S. at 70 (footnote omitted); see also United
States v. Console, 13 F.3d 641, 671-72 (3d Cir. 1993)(with the
exception of a claim of racial discrimination in the selection of
grand jurors, a petit jury's guilty verdict renders harmless any
prosecutorial misconduct before the indicting grand jury)(citing
Vasquez v. Hillery, 474 U.S. 254 (1986)).  Thus, to the extent
there were any deficiencies in the grand jury proceedings, they
must be considered harmless.

Moreover, Locust has not shown that false information was
presented to the grand jury, and has completely failed to
establish any basis for his claim.  Therefore, petitioner is not

64

entitled to relief on this claim because it is wholly lacking in merit.

    10.  *Failure to Hire Expert Witnesses*

    Finally, Locust argues that his counsel was ineffective because he failed to hire an expert witness to counter the State's psychiatric and scientific expert witnesses.

    First, Locust argues that counsel should have called an expert to testify as to Locust's mental condition and the effect of cocaine on petitioner for a diminished capacity or insanity defense on the issue of petitioner's incompetency to confess to the murder.  Locust states that defense counsel had attempted to call an expert witness, Thomas Kelly, a substance abuse expert, on the fourth day of trial but was barred on procedural grounds (namely, a discovery violation).  (See this Opinion, supra, at pp. 43-45).  However, Locust fails to show any actual expert opinion that would have supported a diminished capacity or insanity defense.  Moreover, defense counsel exhaustively and repetitively cross-examined the State witnesses on the issue of defendant's mental state and his being under the influence of cocaine and/or otherwise intoxicated during the custodial interrogation so as to discredit the confession.

    Second, Locust argues that a scientific expert should have been called with respect to the DNA evidence.  He also suggests that a scientific expert should have been called on the issue or manner of the victim's death.  Namely, Locust challenges what he

65

alleges to be conflicting testimony of the autopsy expert, Dr. Peacock, concerning the findings of defensive wounds on the victim who was killed during his sleep. Again, Locust fails to show that an expert opinion on these issues could have been presented at trial, and that such opinions would have discredited the State's DNA expert or the autopsy doctor so as to change the outcome of the jury verdict. In addition, the trial transcript shows that defense counsel thoroughly and vigorously cross-examined the State DNA expert on the issue of the third DNA contributor found on petitioner's clothing and shoes. It would appear that it was a tactical decision not to call an expert witness on these issues. Accordingly, this claim fails for lack of merit.

Therefore, with regard to all of Locust's ineffective assistance of trial counsel claims, as set forth above, this Court concludes that the determination of the state PCR court and appellate court in finding no constitutionally ineffectiveness of counsel, resulted in a decision that was neither contrary to, nor involved an unreasonable application of clearly established federal law under Strickland, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Williams v. Taylor, supra. Locust has failed to demonstrate that the state court opinions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably

justified.  <u>Matteo</u>, 171 F.3d at 891.  Therefore, the Court will
deny federal habeas relief on these claims because they are
substantively meritless.

D.  <u>Cumulative Errors</u>

Lastly, Locust argues that the accumulation of errors
demands a reversal of his conviction and a retrial.  The
applicable test for a "cumulative error" habeas claim is whether
the overall deficiencies "so infected the trial with unfairness
as to make the resulting conviction a denial of due process."
See <u>Hein v. Sullivan</u>, 601 F.3d 897, 917 (9th Cir. 2010)(relying
on <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974), <u>cert.</u>
<u>denied</u>, 131 S.Ct. 2093 (Apr. 18 2011); <u>Thornburg v. Mullin</u>, 422
F.3d 1113, 1137 (10th Cir. 2005)(similarly relying on <u>Donnelly</u>);
<u>see also</u> <u>Fahy v. Horn</u>, 516 F.3d 169, 205 (3d Cir.
2008)(cumulative errors are not harmless if they had a
substantial and injurious effect or influence in determining the
jury's verdict; a habeas petitioner is not entitled to relief
based on cumulative errors unless he can establish "actual
prejudice")(citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637
(1993)).  Simply put, only where the combined effect of errors
renders a criminal defense "far less persuasive than it might
[otherwise] have been" will the resulting conviction violate due
process.  <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302-03 (1973).
Thus, a habeas petitioner is not entitled to relief based on
cumulative errors unless (s)he demonstrates "actual prejudice."

See Murray v. Carrier, 477 U.S. 478, 494 (1986); accord Fahy, 516
F.3d at 205 (explaining that "actual prejudice" must be
established by the petitioner's showing that the errors during
the trial created more than a hypothetical possibility of
prejudice).

Here, Locust contends that the alleged cumulative errors of
trial counsel prejudiced him. However, as set forth above,
Locust has failed to demonstrate actual prejudice with respect to
any of his ineffective assistance of counsel claims. After
carefully examining the underlying record, this Court cannot find
any aspect of petitioner's trial suggesting, singularly or
cumulatively, anything more than a hypothetical possibility of
prejudice at best.

More significantly, Locust has not shown that his trial
counsel's performance was deficient; nor has he satisfied his
burden of proving that the state court decisions regarding
counsel's performance was unreasonable. As the PCR court found:

> ... defense counsel really had a strategically mapped
> out defense.
> [Defense counsel] examined rigorously as to many facts
> that could shed a negative light on the State's witnesses.
> Again during the case in chief counsel [] brought those
> facts back out on cross and tried to establish another
> perpetrator. So he did what he had to do. This was a sound
> and reasonable strategy, especially in light of the
> overwhelming evidence. Besides the confession, there was
> overwhelming evidence that the defendant was guilty in this.

(RE38, November 18, 2005 PCR Transcript, 20:15-21:3).

Accordingly, this Court finds that Locust's claim of cumulative
errors does not merit habeas relief because he has not

demonstrated cumulative prejudice, and because he has failed to make a substantial showing of the denial of a constitutional right.

## V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  See Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition must be denied, and a certificate of appealability will not issue.   An appropriate Order follows.


STANLEY R. CHESLER
United States District Judge

DATED: